**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

UNITED STATES OF AMERICA  :
            :
v.           : Civil Action WMN-02-754
            :
JOHN RACHEL, et al.    :

### MEMORANDUM

Before the Court are Defendants' Joint Motion for Sanctions, To Compel, and in Limine (Paper No. 16), Defendants' Joint Motion for Summary Judgment and Partial Dismissal for Lack of Jurisdiction (Paper No. 17), and the Government's Motion for Summary Judgment (Paper No. 26).[1] The motions have been fully briefed and are ripe for decision. Upon a review of the pleadings and applicable case law, this Court determines that no hearing is necessary (Local Rule 105.6) and that Defendants' Joint Motion for Sanctions, To Compel, and in Limine will be denied; Defendants' Joint Motion for Summary Judgment and Partial Dismissal for Lack of Jurisdiction will be denied, and the Government's Motion for Summary Judgment will be granted in part and denied as moot in part.

### I. BACKGROUND

---

[1] Also before the Court is the Government's Motion to Amend or Correct the Scheduling Order (Paper No. 14). Subsequent to its filing of this motion, the Government characterized it as "moot." Accordingly, the Court will deny it as moot.

On November 17, 1994, Defendant RGI entered into a "Teaming Agreement" with Diez Management Systems, Inc. (DMSI) to cooperate in obtaining and satisfying an Internal Revenue Service (IRS) contract for computer maintenance and repair. Defendant John Rachel, owner and president of RGI, signed the Teaming Agreement on behalf of RGI.  The contract, known as MNOMAP, had two components: on-site maintenance for all of the computer equipment in IRS facilities in the Washington, D.C. region, and nation-wide mail-in repair of laptop or notebook computers.  On or about October 1, 1995, DMSI was awarded the IRS contract.  Under the terms of that contract, DMSI would service and repair laptop computers for the IRS, billing the IRS for the actual cost of time and materials utilized in the repairs, plus a fixed markup.

John Rachel, along with a design team of RGI employees, developed a means to repair the broken laptop hinges (the "Hinge Repair Kit").  Rachel created initial prototypes of the Hinge Repair Kit; one prototype was prepared by Technical Design Resources (TDR).  Rachel later obtained a patent for his Hinge Repair Kit.

Under the IRS-DMSI contract, when an IRS laptop computer needed its hinge repaired, it was mailed or shipped to a location which met the security requirements for safeguarding

IRS property and information.  This location was referred to
as the depot or the repair depot.  At the depot, RGI and later
DMSI employees would prepare each laptop computer for repair
by removing the screen and any electronics from the laptop
cover.  John Rachel personally picked up the laptop covers
from the depot and delivered them to TDR, which was
responsible for manufacturing the Hinge Repair Kits in
accordance with the specifications set forth in the patent.
TDR personnel installed the Hinge Repair Kits as set forth in
the patent.  Rachel would then personally pick up the covers
with the Hinge Repair Kits installed and return them to the
depot, where employees would reassemble the laptops.

Initially, RGI obtained the Hinge Repair Kits directly
from TDR.  Later, however, another company, Computer
Specialties of Maryland (CSM), obtained the repaired laptops
from TDR.  On or about October 17, 1995, John Rachel executed
Articles of Incorporation for Defendant CSM.  The CSM Articles
of Incorporation were filed on October 23, 1995.  Defendant
Priscilla Rachel is the wife of John Rachel and served as the
Secretary to CSM.  CSM had no employees; it paid no wages or
salaries during its existence.  Its financial records were
maintained by John Rachel at his residence or RGI offices.
CSM's physical address, was RGI's office space in Glen Burnie,

Maryland.  Its mailing address was a post office box.  Among
the services John Rachel performed for CSM was preparing CSM's
invoices to RGI for the Hinge Repair Kits, which TDR had
installed in the laptop cover shells delivered by John Rachel.
Rachel prepared the CSM invoices on a typewriter in his
kitchen.

TDR invoiced CSM an amount between $23.20 and $26.70 for
each Hinge Repair Kit manufactured and installed.  CSM paid
these invoices.  CSM then invoiced RGI $117 for each Hinge
Repair Kit manufactured and installed by TDR.  RGI prepared
and submitted invoices to DMSI, billing DMSI $122.84 for each
Hinge Repair Kit.  DMSI included the payments to RGI in its
invoices to the IRS for payment of services rendered under the
Contract, billing the IRS $128.99 for each Hinge Repair Kit.
The IRS paid those invoices.

In November 1997, the IRS terminated the Contract.
Subsequently, CSM ceased all operations, forfeited its
corporate charter, and closed its bank accounts.

The Government brought the present action against
Defendants RGI, CSM, John Rachel, and Priscilla Rachel on the
basis of the invoice markup between CSM and RGI.  As explained
above, CSM invoiced RGI for approximately five times its cost
from TDR.  The Government alleges that this markup was

4

fraudulent and that John and Priscilla Rachel profited
significantly from the inflated costs passed on between CSM
and RGI, both controlled by John and/or Priscilla Rachel.  In
the instant action, the Government alleges violation of the
False Claims Act, 31 U.S.C. § 3729(a)(1) (Count I), violation
of the False Claims Act, 31 U.S.C. § 3729(a)(2) (Count II),
violation of the False Claims Act, 31 U.S.C. § 3729(a)(3)
(Count III), fraud--common law (Count IV), negligent
misrepresentation (Count V), breach of contract--RGI and CSM
only (Count VI), payment under mistake of fact (Count VII),
and unjust enrichment (Count VIII).  Both the Government and
Defendants move for summary judgment as to all counts of the
Complaint.  The Government seeks summary judgment with respect
to liability alone at this time.

**II.  LEGAL STANDARD**

A moving party is entitled to summary judgment only if it
can show that there exists no genuine issue as to any material
fact, and that it is entitled to judgment as a matter of law.
See Fed. R. Civ. P. 56(c); Blue Ridge Ins. Co. v. Puig, 64 F.
Supp.2d 514 (D. Md. 1999) (citing, inter alia, Celotex Corp.
v. Catrett, 477 U.S. 317, 322 (1986)).

When both parties file motions for summary judgment, the
court applies the same standards of review.  Taft Broadcasting

<u>Co. v. United States</u>, 929 F.2d 240, 248 (6th Cir. 1991); <u>ITCO</u>
<u>Corp. v. Michelin Tire Corp.</u>, 722 F.2d 42, 45 n. 3 (4th Cir.
1983) ("The court is not permitted to resolve genuine issues
of material facts on a motion for summary judgment--even where
... both parties have filed cross motions for summary
judgment.")(emphasis omitted), <u>cert</u>. <u>denied</u>, 469 U.S. 1215
(1985).  The role of the court is to "rule on each party's
motion on an individual and separate basis, determining, in
each case, whether a judgment may be entered in accordance
with the Rule 56 standard."  <u>Towne Mgmt. Corp. v. Hartford</u>
<u>Acc. and Indem. Co.</u>, 627 F.Supp. 170, 172 (D. Md.
1985)(quoting Wright, Miller & Kane, <u>Federal Practice and</u>
<u>Procedure: Civil</u> 2d § 2720 (2d ed. 1993)).

**III.  DISCUSSION**

    <u>A.  Defendants' Joint Motion for Sanctions, to Compel,</u>
<u>and       In Limine</u>

    Defendants move pursuant to Federal Rules of Civil
Procedure 26 and 37 for an order of sanctions "in the nature
of an order in limine to preclude the government from offering
evidence to support its claims and for costs and fees, and an
order compelling production of documents withheld under a
claim of privilege, and for amendment of admission responses."

Defs.' Mot. at 1.[2]  With respect to the request for an order
in limine, Defendants argue that the Government's proffered
30(b)(6) witnesses, interrogatory responses, and document
responses were so lacking as to constitute no proffer or
response at all.  Id. at 8.  First, with respect to the
30(b)(6) witnesses, Defendants claim that the designees had
virtually no knowledge of anything listed in their deposition
notice.  Id.  According to the Government, defense counsel
refused the Government's initial offer of two agents as the
30(b)(6) designees.  The Government then produced for him the
individuals he requested, but notified him that these
individuals were limited to discussing the matters of which
they had personal knowledge, because they were uninvolved in
the investigation or case.  After taking their depositions,
defense counsel expressed his dissatisfaction with the
witnesses and indicated that he would depose one of the agents

--------

[2] The Court notes that Defendants failed to comply with
Local Rule 104.8, which requires that the parties exchange
their motions to compel, opposition memorandum, and any reply
and then discuss the dispute before filing papers with the
Court.  Defendants argue that they complied with the spirit,
if not the technical requirements, of the Local Rules.  See
Defs.' Reply at 3-4.  The Court will consider Defendants'
motion in the interest of judicial efficiency but notes that
its decision to do so should not be construed as excusing
Defendants' failure to follow the procedures mandated by this
Court in its Local Rules.  Coogan v. Cornet Transp. Co., Inc.,
199 F.R.D. 166, 166-67 (D. Md. 2001).

originally offered by the Government.  That agent was deposed
within a week.  In the cross-examination of that agent,
Government counsel had the agent trace through several
transactions to identify what the Government believed to be
the fraudulent conduct.  Govt.'s Opp. at 8-9.  During this
cross-examination, defense counsel made repeated comments
about the cross-examination wasting his time, and it appears
from the transcript that he was on the telephone during a
portion of the cross-examination.  <u>See</u> Govt.'s Exh. 13 to
Govt.'s Mot. for Summary Judgment, Luzier Dep., at 91.

    The Court will not enter an order for sanctions against
the Government for the 30(b)(6) witnesses.  The Court is
satisfied that the Government fulfilled its discovery
obligations with respect to its designees.  It appears from
the record that Defendants had more than an adequate
opportunity to depose a wide variety of people related to the
underlying transactions.

    Second, with respect to the interrogatory responses,
Defendants argue that the Government's response referring
Defendants "to the documents produced pursuant to the Response
to Request for Production for such additional witnesses or
information as may be derived or ascertained from such records
as easily by the Defendants as by the United States" (Defs.'

Exh. 6, Plaintiff's Answers to Interrogatories, at 3, 5, 6, 8, 9, and 12) was unacceptable and equivalent to no response at all. The Court concludes that the Government's interrogatory responses were appropriate. The interrogatories were extremely broadly worded. <u>See</u> Defs.' Exh. 6, Plaintiff's Answers to Interrogatories. Federal Rule of Civil Procedure 33(d) allows a party the option to produce the records when the requesting party is as capable of reviewing documents and formulating a response to the interrogatory as is the answering party. The Court concludes that the Government appropriately used Fed.R.Civ.P. 33(d) in this situation.

Finally, with respect to the document production, Defendants claim that the Government did not comply with Fed.R.Civ.P. 33 "in any way, shape, or form." Defs.' Mot. at 10. According to Defendants, the documents consisted of 175 boxes of materials, an additional 10 filing cabinets of documents, and numerous computer diskettes and were produced in "an unheated, unlit garage, stacked 8 feet high and 2-4 files/cabinets deep along the walls, with additional boxes and documents in the middle of the garage. There were no chairs, no table, no room to separate the materials, and no room to even walk inside the garage." <u>Id.</u> at 3.

The Court concludes that the Government's actions were

9

appropriate.  The document requests were again extremely
broad, and the Government provided access to all available
documents.  According to the Government, these documents were
provided as they were maintained in the ordinary course of
business in the government investigation.  They were
maintained in the same location and form when reviewed by
government counsel.  Further, the Government provided the two
agents assigned to the case to the defense counsel to assist
him in the same manner as they assisted government counsel.
When defense counsel complained about the production location,
he was told, then and later, that he could identify all or
some of the boxes, and they would be relocated to a conference
room for his review under more comfortable conditions.  He
failed to take advantage of this accommodation at any time.

Defendants also claim that the Government failed to
respond in a timely manner to some of their requests, i.e., a
request for an inventory of the document warehouse and a
Vaughn index of privileged documents.  Defs.' Mot. at 5-7.
The record reflects that any delays were the result of an
injury to the government counsel, who required surgery for a
broken foot, and the subsequent weather delays.  The
Government produced the inventory within a few days of its
receipt by government counsel, if the days of forced absence

10

are excluded.  Likewise, the Vaughn index of privileged
documents was provided within days of government counsel's
return to the office after her injury.  Moreover, government
counsel repeatedly offered to extend discovery if these delays
caused any hardship or prejudice for Defendants; Defendants
refused any extension.  Govt.'s Opp. at 12.

     Additionally, Defendants argue that the Government has
waived any claims of privilege by disclosing the privileged
documents to Defendants.  Defs.' Mot. at 12.  At the
warehouse, Defendants apparently viewed some documents that
were accidently left out but contained privileged information.
Defendants now argue that the "so-called privilege has been
waived, and the documents listed [as privileged] should be
ordered to be copied and provided to defendants forthwith."
Defs.' Mot. at 15.  According to the declarations of the
special agents assigned to this case, one folder of privileged
agent notes were inadvertently left in the storage facility.
As soon as the agent realized that defense counsel had these
documents, he retrieved them and told defense counsel at that
time that they were privileged and were not supposed to be in
the facility.  Govt.'s Opp. at 12.  Under the standard adopted
by the Fourth Circuit in In re Grand Jury Proceedings, 727
F.2d 1352 (4th Cir. 1984), these documents have clearly been

identified as agent notes, which were work product materials
and were segregated from other documents. They were intended
to be confidential and were treated accordingly. The
momentary lapse in failing to remove them from the storage
facility was not a knowing and voluntary waiver of any
privilege, and the Court will not order the Government to
produce them to Defendants.

Finally, Defendants argue that the Government should be
directed to amend its admission responses. Defs.' Mot. at 15-
16. According to Defendants, "it is beyond clear that
plaintiff's claim of lack of knowledge regarding the Ichiban
matter[3] was incorrect from day one." Id. Defendants claim
that during their document review, defense counsel found
numerous Ichiban related materials that answered the admission
requests and now argue that the Government should be ordered
to amend its admission responses accordingly. The Court
declines to do so. It appears that Defendants want to use

_____

[3] Ichiban was identified by Defendants as a company that
sold that same product at issue in this case at a price
comparable to the price charged by Defendants. Defs.' Mot. at
15. Several of Defendants' Requests for Admissions relate to
Ichiban and this topic. See Defs.' Exh. 8, Plaintiff's
Response to Defendants' First Request for Admissions. The
Government in its responses noted that it was unable to
respond at that time to these admissions and that "to the
extent the United States is subsequently able to respond to
these admissions, it will file updated responses." Id.

these responses to show that Ichiban sold products at a price

"comparable to the price that the government claims here

constituted overcharges by defendants when [defendants] sold

that same product." Defs.' Mot. at 3. As explained below,

what is relevant in this action is whether the CSM markup of

the TDR invoice was fraudulent. See infra at 17. Whether

another company sold a product at the same price as Defendants

is simply not relevant to the issue of whether Defendants

fraudulently inflated their invoices. Based on the above

analysis, the Court will deny Defendants' Joint Motion for

Sanctions, to Compel, and in Limine.

    B.  Cross Motions for Summary Judgment

    Under the False Claims Act (FCA), it is unlawful for any

person to

> (1) knowingly[4] present[], or cause[] to be
> presented, to an officer or employee of
> the United States Government or a member
> of the Armed Forces of the United States a
> false or fraudulent claim[5] for payment or

---

    [4] For purposes of the FCA, the terms "'knowing' and
'knowingly' mean that a person, with respect to information
(1) has actual knowledge of the information; (2) acts in
deliberate ignorance of the truth or falsity of the
information; or (3) acts in reckless disregard of the truth or
falsity of the information, and no proof of specific intent to
defraud is required." 31 U.S.C. § 3729(b).

    [5] Under the FCA, a "'claim' includes any request or
demand, whether under a contract or otherwise, for money or
property which is made to a contractor, grantee, or other

approval;

(2) knowingly make[], use[], or cause[] to
be made or used, a false record or
statement to get a false or fraudulent
claim paid or approved by the Government;

(3) conspire[] to defraud the Government
by getting a false or fraudulent claim
allowed or paid . . . .

31 U.S.C. §§ 3729(a)(1)-(3).

As mentioned above, in this action, the Government
alleges that RGI owner John Rachel formed a shell corporation,
CSM, in order to inflate costs and issue false invoices to
RGI, which RGI then used to bill the prime contractor, DMSI.
In this manner, RGI would appear to be in compliance with the
pricing terms of the DMSI-IRS Contract, while its alter ego,
CSM, also wholly owned by John Rachel, would make a profit of
approximately 300 to 400 percent.  As an initial matter,
Defendants argue that "there is no evidence anywhere in the
record that Priscilla Rachel had any involvement in anything
relevant to the facts of this case."  Defs.' Mot. at 19.
Defendants claim that she "knew nothing, received nothing,
worked on nothing, and had no connection to the acts alleged

---

recipient if the United States Government provides any portion
of the money or property which is requested or demanded, or if
the Government will reimburse such contractor, grantee, or
other recipient for any portion of the money or property which
is requested or demanded."  31 U.S.C. § 3729(c).

in the complaint," and that summary judgment in her favor is appropriate.  Id.  In support of their arguments, Defendants cite cases in which "innocent spouses" have escaped liability. See Defs.' Opp. at 37-39.  The Government argues that although Priscilla Rachel was not involved in the day to day operation of the scheme, she was a member of the board of directors of RGI during this period; she allowed her husband to use and sign her name freely and conduct business in her name; and her husband prepared the CSM invoices in their kitchen.  Govt.'s Mot. at 19.

Under 31 U.S.C. § 3729(b), the FCA defines the terms knowing and knowingly broadly to include individuals who act in "deliberate ignorance" or "reckless disregard" of the facts.  The "corporate ostrich" was a specific target of Congress when it drafted the statutory language.  According to the Senate Judiciary Committee, the definition of knowing and knowingly "attempts to reach what has become known as the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquires which would alert him that false claims were being submitted." S.Rep.No. 345, 99th Cong., 2d Sess. 17, 21 (1986), reprinted in 1986 U.S.C.C.A.N. 5266.

In this case, the Court is satisfied that Priscilla

Rachel acted at least in reckless disregard of the truth or falsity of the information being submitted by CSM to RGI and eventually to the IRS.  She served on the board of directors of RGI and had obligations with respect to the performance of those duties.  Govt. Exh. 1., Defs.' Responses to Pl.'s First Request for Admissions (Admission Responses), at ¶¶ 30, 31; Govt. Exh. 11, P. Rachel Dep., at 7-9.  She was identified in documents as an incorporator, officer, and director of CSM. Govt. Exh. 10, CSM Articles of Incorporation; Govt. Exh. 12, Combined Resolution Signet Bank.  Both John and Priscilla Rachel admitted that she allowed her husband to use her name and her identity to conduct business for her.  Govt. Exh. 2, J. Rachel Dep., at 60-61, 65-66; P. Rachel Dep. at 45-47. Based on the above discussion, the Court concludes that summary judgment as to Priscilla Rachel based on the level of her involvement is inappropriate.

In their motion for summary judgment, Defendants argue "nothing in any contract or law precluded RGI or any defendant from charging $122.85 to DMSI or the IRS for this hinge repair."  Defs. Mot. at 3.[6]  Defendants focus on the MNOMAP

---

[6] Defendants argue that the IRS knew from the beginning that each repair would cost $122.85 and that "everyone understood that it covered the warranty risk . . . ."  Defs. Mot. at 16.  Before the Contract was awarded, Defendants met with George Watona, the Government's Contracting Officer's

Contract between the IRS and DMSI and argue that because RGI was not a party to that contract, it was not bound by its terms. Id. at 15. Additionally, Defendants claim that "nothing in any federal statute or regulation required RGI to charge any particular amount, or prohibited RGI from charging any amount it desired, for the hinge repair." Id. at 18.

In the Government's motion for summary judgment, it argues that Defendants' conduct violated the FCA, without reference to the Contract or the Federal Acquisition Regulations (FAR), because Defendants caused a false claim (composed of the inflated invoice from CSM to RGI) to be submitted to the United States by DMSI. Govt.'s Mot. at 17-18. Under the FCA, a direct contractual relationship with the

---

Technical Representative to discuss some aspects of the Contract. The issue of cost arose during this discussion, and according to Watona's deposition, he asked an RGI representative to give an estimate on what the hinge repair would cost per unit. Defs. Exh. 20, Watona Dep., at 10. In response, the Government argues that Watona was clear that he was seeking just a ball-park figure for the hinge repair. He was not responsible for negotiating any financial aspects of the contract, and he simply lacked the authority to agree on a fixed price contract on this or any other item. Id. at 37-38. Moreover, the final IRS-DMSI Contract is very specific that it is a time and materials contract that requires that materials be billed at cost, not a fixed-price contract. Defs.' Exh. 6, MNOMAP Contract. The Court affords little weight to Defendants' contention that the Government understood that it would be paying for the hinge repair and the warranty cost, and therefore, no fraudulent behavior on behalf of Defendants occurred.

Government is not required for liability.  The provisions of

the FCA indicate "a purpose to reach any person who knowingly

assisted in causing the Government to pay claims which were

grounded in fraud, without regard to whether that person had

direct contractual relations with the Government."  <u>United

States v. Veneziale</u>, 268 F.2d 504, 506 (3rd Cir. 1959) (citing

<u>United States ex rel. Marcus v. Hess, et al.</u>, 317 U.S. 537,

544-45 (1943)).  Here, the relevant inquiry is whether the CSM

markup of the TDR invoice was fraudulent.

Defendants argue that the markup was justified because of

the additional costs incurred by CSM, beyond the cost of the

Hinge Repair Kits from TDR.  Defendants claim that the price

reflected a warranty cost to cover the work performed;[7] "an

enormous minimum order" that Defendants guaranteed to TDR;

"payment of Mr. Rachel for his time, risk and efforts in

developing and patenting the item;" costs incurred in

patenting the device; and administrative costs.  Defs.' Opp.

at 22.  With respect to the minimum order, the evidence

Defendants cite in response does not support their argument.

Defendants' Exhibit 22 does not include any testimony of this

_____

[7] In the IRS-DMSI Contract, the Government required "the
Contractor to propose a solution including a six-month
warranty (parts and labor) on repairs to the . . . notebook
hinges/cases."  Defs.' Exh. 6, MNOMAP Contract, at ¶ C.5.3.

order where indicated, and Defendants' Exhibit 23 is an
informal letter indicating that, rather than being guaranteed
a minimum amount of work, TDR was informed only that it would
be asked to supply "up to" a certain number of hinge repair
kits.  With respect to the other costs presented by Defendants
in their pleadings, Defendants simply provide no evidence to
support their arguments.

When asked at his deposition to explain the markup, John
Rachel attributed it to normal business expenses, guarantees,
and warranties.  J. Rachel Dep. at 121-22.  He claimed he had
to make warranty payments and "a lot of other things."  Id. at
128.  Rachel admitted, however, that he never drew a salary
from CSM, that CSM had no employees, that he personally picked
up and delivered the laptops to and from the repair depot, and
that he prepared CSM's invoices in the kitchen of his house.
Id. at 121-22.

The Court concludes, with little difficulty, that the CSM
markup of the invoice was fraudulent.  As explained above, CSM
and RGI were owned by the same person.  CSM had no employees,
paid no wages or salaries during its existence, used as its
physical address RGI's office space in Glen Burnie, Maryland,
used a post office box as its mailing address, and kept its
records in John Rachel's house and/or in his office at RGI.

19

Additionally, it ceased operations at some point after the
Government terminated the IRS-DMSI contract.  With respect to
the warranty expenses, no evidence was presented regarding the
actual costs, and Defendants admit that CSM did not
specifically segregate funds to provide for warranty expenses.
Admission Responses, at ¶ 91.  The Court finds it difficult to
believe that a six-month warranty would cost four times the
amount of the product itself.  Because Defendants have failed
to demonstrate that a triable issue of fact exists for trial,
the Court must grant summary judgment as to liability in favor
of the Government as to Counts I, II, and III.[8]

Counts VI through VIII of the Complaint plead different
theories of liability (e.g., fraud, breach of contract, unjust
enrichment, etc.) for the same injury to the Government--the
markup of the CSM invoice.  The one wrong, one recovery rule
precludes a party from double recovery for a single injury.
Kramer v. Emche, 64 Md.App. 27, 40 (1985) (citing Cox v.
Maryland Railways Co., 126 Md. 300 (1915)).  "[P]leading
several different theories or causes of action does not . . .
transform a single injury into multiple injuries."  Id. at 40.

---

[8] Because the Court concludes that Defendants have not
shown that they are entitled to judgment as a matter of law,
it will deny Defendants' motion for summary judgment as to
Counts I, II, and III.

Because the Court has determined that Defendants are liable for this injury under the FCA, it will deny as moot both Defendants' and the Government's motions for summary judgment as to the remaining counts.

**IV.  CONCLUSION**

For the foregoing reasons, the Court will deny Defendants' Joint Motion for Sanctions, To Compel, and in Limine and Joint Motion for Summary Judgment and Partial Dismissal for Lack of Jurisdiction, and will grant in part and deny as moot in part the Government's Motion for Summary Judgment.

_____/s/_____

William M. Nickerson
Senior United States District
Judge

Dated: July 10, 2003