IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
|     Plaintiff | : |
| | Case No. WMN-02-754 |
| v. | : |
| JOHN RACHEL, et al. | : |
|     Defendant | |

...oOo...

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON DAMAGES**

The United States of America, by and through its counsel Thomas M. DiBiagio, United States Attorney for the District of Maryland, and Tamera L. Fine, Assistant United States Attorney for said district, hereby submits this Memorandum of Law in Support of Its Motion for Summary Judgment on Damages.

On July 10, 2003, Judge Nickerson denied the defendants' motion for summary judgment and dismissal and granted in part the Government's motion for summary judgment on liability, determining that the Defendants had violated the False Claims Act, which rendered the government's other claims moot. Only February 13, 2004, after abortive settlement discussions between the parties, this Court set a briefing schedule for the United States to file the instant motion to determine the appropriate damages for the fraud perpetrated by the defendants. This memorandum is filed in support of that motion.

I.  Statement of Undisputed Facts

Although this Court has determined liability in this case, the United States will very briefly outline the fraud scheme in this case to the extent required to understand the damages computations.

A.  Background Facts Regarding Liability

On November 17, 1994, RGI entered into a "Teaming Agreement" with Diez Management Systems, Inc., ("DMSI") to cooperate in obtaining and satisfying the IRS MNOMOP contract for computer and maintenance repair.  John Rachel was the President of RGI and wholly owned and controlled the company.  RGI was identified as a subcontractor by DMSI in the documents DMSI submitted to the Government in connection with the MNOMAP contract.  The contract had two components: on-site maintenance for all the computer equipment in the IRS facilities in the Washington, D.C. region and nation-wide mail-in repair of computers.  Under the terms of the contract, DMSI would service and repair computers for the IRS, billing the IRS for the actual cost of time and materials utilized in making the repairs, plus a fixed mark-up (a Time-and-Materials-type contract).

Under the terms of the contract, when an IRS laptop computer needed hinge repairs, it was mailed or shipped to a location referred to as the "depot."  At the depot, RGI and DMSI employees would prepare each computer for repair by removing the screen and any electronics from the laptop cover.  John Rachel personally picked up the covers from the depot and delivered them to Technical Design Resources (TDR), which was responsible for manufacturing and installing the hinge repair kits.  John Rachel then would personally pick up the covers from TDR

after the hinge repair kits were fixed and installed, and return them to the depot, where employees would reassemble the laptops.

Shortly after beginning work on the contract, John Rachel and his wife Priscilla incorporated Computer Specialties of Maryland (CSM). Acting exclusively through John Rachel, CSM began acting as an intermediary between RGI and TDR to satisfy the IRS contract. CSM would obtain the repaired laptops from TDR, and then bill RGI for these services. Priscilla Rachel was identified in corporate documents as the Secretary to CSM, was a director of RGI, and generally allowed her husband to use her identity to conduct business and perpetrate the fraud. John Rachel was the President of CSM. CSM had no employees and paid no wages or salaries during its existence. CSM's financial records were maintained by John Rachel at his residence or at the offices of RGI. CSM's physical address was RGI's office space located in Glen Burnie, MD. Its mailing address was a post office box. John Rachel prepared CSM's invoices to RGI on a typewriter in his and Priscilla's kitchen.

TDR invoiced CSM an amount between $23.20 and $26.70 for each hinge repair kit. CSM paid TDR these invoices and then invoiced RGI $117 for the same repair kits. RGI in turn prepared and submitted invoices to DMSI billing them $122.84 for each of the same hinge repair kits. DMSI included the payments to RGI in its invoices to the IRS for payment of services rendered under the contract, billing the IRS $128.99 for each hinge repair kit. The IRS paid these invoices. In November 1997, the IRS terminated the hinge-repair contract with DMSI. Shortly thereafter, CSM ceased operations.

On July 10, 2003, this Court denied defendants' motions for summary judgment and dismissal and granted (in part) the Government's motion for summary judgment, determining

that the Defendants had violated the False Claims Act, rendering the remainder of the government's claims moot. In its opinion, the Court concluded, "with little difficulty, that the CSM markup of the invoice was fraudulent."

B.  Damages Computation

The government now moves for summary judgment on the issue of damages. In support it provides the declarations of Assistant Special Agent In Charge William Harry Armstrong and Special Agent Douglas Luzier, as well as supporting documentation.

Special Agent Luzier has prepared a spreadsheet, with the assistance of auditor Randy Gregory, Treasury Inspector General for Tax Administration (the "Summary Spreadsheet"), which summarizes the invoices and payments relative to the Hinge Repair Kits on the MNOMAP contract. It includes TDR invoices to RGI/CSM, CSM invoices to RGI, RGI invoices to DMSI, and DMSI invoices to the IRS, as well as the payments associated with these invoices. The Summary Spreadsheet is attached to Special Agent Luzier's declaration as Exhibit A. The supporting documents are provided as Exhibit B to that declaration.

The Summary Spreadsheet is essentially a more detailed version of the draft spreadsheet prepared during Special Agent Luzier's deposition in this case. In that deposition, held on December 18, 2002, government counsel, on cross-examination, reviewed a complete contract "cycle" with Special Agent Luzier while he prepared a draft spreadsheet representing the cycle, which was one complete series of invoices from TDR to CSM to RGI to DMSI to the IRS, and one complete series of payments for those invoices, flowing from the IRS to DMSI to RGI to CSM to TDR. The transcript for this deposition, along with the relevant documents, including invoices, checks and the draft spreadsheet, were previously submitted with the government's

4

Motion for Summary Judgment on liability issues, and are resubmitted as Exhibit C to Special Agent Luzier's declaration, for the convenience of the Court.

As set forth in the Summary Spreadsheet, there were 26 invoices requesting payment that were submitted by DMSI to the Internal Revenue Service, an agency within the U.S. Department of Treasury. Included in these invoices were services by RGI/CSM and TDR for the Hinge Repair Kits. The DMSI invoices included the amounts invoiced to them from RGI, CSM, and TDR. DMSI paid RGI $643,365 for the Hinge Repair Kits. RGI/CSM paid TDR an amount of $132,971 for their services on the Hinge Repair Kits.

The declaration of Assistant Special Agent In Charge Armstrong computes the final damages in this case, relying upon the Summary Spreadsheet. Essentially, it makes two adjustments to the difference between what was paid for the hinge repair work and what would have been paid if there had been no fraud. First, it eliminates some claims which were outside of the Statute of Limitations when the complaint was filed. Secondly, it accounts for the five percent markup on the fraudulent amount which was charged by DMSI in its invoices to the IRS.

Assistant Special Agent In Charge Armstrong determines that the total amount of single damages in this case is $434,694.96. Next he multiplies this by three to get triple damages of $1,304,084.88. Finally, he adds $220,000 in penalties for the 22 invoices submitted by DMSI to the IRS which contained inflated hinge repair expenses. All together, the United States has established a total of statutory triple damages and statutory penalties totaling $1,524,084.88.

II.  ARGUMENT

A.  Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure mandates that a court enter summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law."  Specific material evidentiary facts, not unsupported speculation, must be shown to overcome summary judgment. Ash v. United Parcel Service, Inc., 800 F.2d 409, 411-12 (4th Cir. 1986).  As this Court has explained:

> One of the purposes of Rule 56 is to require a plaintiff, in advance of trial and after a motion for summary judgment has been filed by a defendant and properly supported, to come forward with some minimal facts to show that the defendant may be liable under the claim alleged.  In the absence of such a minimal showing, a defendant should not be required to undergo the considerable expense of preparing for and participating in the trial of those issues addressed in a motion for summary judgment.

Stout v. Home Life Ins. Co. 651 F. Supp. 28, 31 (D. Md. 1986) (Harvey, C.J.), aff'd, 818 F.2d 29 (4th Cir. 1987); see also Pfeifer v. Lever Bros. Co., 693 F. Supp. 358, 362 (D. Md. 1987) (Harvey, C.J.), aff'd 850 F.2d 689 (4th Cir. 1988); E.F. Hutton Mortgage Corp. v. Equitable Bank, N.A., 678 F. Supp. 567 (D. Md. 1988) (Harvey, C.J.).

If, moreover, there is no genuine dispute as to any material fact, a court should grant summary judgment "to conserve judicial time and energy by avoiding an unnecessary trial and by providing a speedy and efficient summary disposition."  Stout, 651 F. Supp. at 31 (citing Bland v. Norfolk & Southern Railroad, 406 F.2d 863, 866 (4th Cir. 1969)).  Thus, the Supreme Court has held that trial courts should enter summary judgment "against any party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

On the basis of the Supreme Court's Celotex decision, the Fourth Circuit has emphasized that trial judges have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987); see also Celotex, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1) (summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'").

B. The United States is entitled to summary judgment on damages in this case.

The United States seeks recovery in this case principally under the False Claims Act, 31 U.S.C.§3729 (the "FCA"). The FCA provides, in relevant part, as follows:

> § 3729. False claims
>
> (a) Liability for certain acts.--Any person who--
>
>> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
>>
>> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
>>
>> (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . .

The FCA is a powerful tool against fraud that is perpetrated on the United States government. This case is a perfect example of the type of conduct which the FCA was designed to address.

C.  The Computation of Single Damages

Damages in an FCA case are intended to make the United States "completely whole" and "afford the government complete indemnity for the injuries done to it." *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (19943). There is no requirement that damages be proved with exactitude. Although damages cannot be speculative, they do not have to be proven with "mathematical certainty." *Bigelow v. RKO Radio Pictures, Inc.* 327 U.S. 251, 264 (1946). Indeed, a "just and reasonable estimate" is acceptable. *United States v. American Packing Corp.*, 125 F. Supp. 791-92 (D.N.J. 1954)

Generally, actual damages are the difference between what the United States paid and what it would have paid without the fraud. *United States v. Bornstein*, 423 U.S. 303, 316, n. 13 (1976). In a case such as this with inflated invoices, "[t]he measure of actual damages is determined by the amount paid due to the false claim minus the amount paid had the claim been truthful." *United States v. Aerodex, Inc.*, 459 F.2d 1003, 1011 (5th Cir. 1973). In addition to damages directly caused by the fraud, such as the amount of the fraud itself, FCA damages include damages which "naturally and proximately resulted from the fraud." *United States v. Ben Grunstein & Sons Company,* 137 F. Supp. 197, 207 (D.N.J. 1955).

The FCA also provides for the imposition of penalties. In fact, the government is entitled to penalties solely upon proof that false claims were made, even without any proof of actual

damages as a result of those false claims. *Rex Trailer Co. v. United States*, 350 U.S. 148, 152-53 (1956).

In this case the government has exhaustively analyzed the available data and computed the damages fully. The Summary Spreadsheet sets forth the billing and payment history with regard to the hinge repairs. The final computation gives defendants credit for the amount they were entitled to bill for the hinge repairs absent fraud. The government has been careful to back out any damages related to invoices submitted to the IRS outside of the statute of limitations. It has even adjusted the damages total to account for the additional five percent markup on the fraudulent amount, which was "proximately caused" by the fraud. The United States has more than met its burden with regard to establishing the damages in this case.

The same is true for the penalties. Rather than utilize the number of invoices submitted by CSM to RGI or the number of invoices from RGI to DMSI, it has utilized the far smaller and more conservative number of invoices submitted by DMSI to the IRS, because those are the "false invoices" which the defendants "caused to be submitted" and upon which their liability is based.

### III. CONCLUSION

This case is not one in which the defendants have simply failed to "turn square corners" with regard to government contracting. *United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 302 (6h Cir. 1998) In this case defendants successfully set up a scheme, using a shell corporation and fraudulent invoices cooked up at the kitchen table, to systematically overcharge the government between 300 and 400 percent of the cost of a part. They successfully hid their fraud from the prime contractor and from government auditors. Finally, with this

Court's July, 2003, Order and Memorandum, these debtors were held accountable for their conduct. Now the United States has established with specificity the damages and penalties associated with the defendants' fraud. Accordingly, the United States respectfully asks this Court to enter Judgment in favor of the United States for $1,304,084.88 in triple damages, $220,000.00 in statutory penalties, post judgment interest at the rate established by law, and for such other and further relief as this Court deems just and proper.

February 27, 2004

Respectfully submitted,

Thomas M. DiBiagio
United States Attorney

Tamera L. Fine

_____
Tamera L. Fine
Assistant United States Attorney
6625 United States Courthouse
101 West Lombard Street
Baltimore, Maryland 21201-2692
410-209-4806