**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| **Plaintiff** | : |
| | :    **Case No. WMN-02-754** |
| v. | : |
| **JOHN RACHEL, et al.** | : |
| **Defendants** | : |

...oOo...

<u>Declaration of Assistant Special Agent In Charge William Harry Armstrong</u>

I, William Harry Armstrong, hereby declare under penalty of perjury, that the following statements are true and correct to the best of my knowledge and ability.

1. I am currently an Assistant Special Agent In Charge of the United States Department of the Treasury. I have been a Special Agent, Senior Special Agent, or Assistant Special Agent In Charge since June, 1990.

2. In June, 1998, I was assigned to assist in an ongoing investigation of allegations of fraud in contracts to provide services to the Internal Revenue Service and the Federal Aviation Administration.

3. In connection with a Federal Aviation Administration (FAA) contract (DTFA-92-C-00015); John RACHEL was indicted on April 15, 1999 for Conspiracy, 18 U.S.C. § 371; Unlawful Kickbacks, 41 U.S.C. § 53; and, Engaging in Monetary Transactions in Property Derived From Specific Unlawful Activity, 18 U.S.C. § 1957. On July 19, 1999, John Rachel pled guilty to taking unlawful kickbacks in conjunction with the FAA contract and on October 29, 1999, was sentenced to one-year imprisonment and fined $10,000. On August 25, 2000, Mr.

1

Rachel was debarred from Government contracting, pursuant to the Federal Acquisition Regulations § 9.406 for a period of three years.

4. During the investigation we determined that John Rachel and his wholly owned businesses RGI, Inc. and Computer Specialties of Maryland, Inc. (CSM) had been involved in a scheme to defraud the government of substantial sums of money by issuing fraudulent invoices from CSM to RGI for goods and services under what was known as the Maintenance of National Office Microcomputers and Peripherals (MNOMAP) contract. The MNOMAP contract was with the Internal Revenue Service (IRS). RGI then claimed the inflated charges as its "cost," thereby insulating the fraud from discovery. This fraud, in excess of $500,000, occurred in conjunction with the MNOMAP Contract, number TIRNO-96-C-00009, which was awarded to Diez Management Systems Inc. (DMSI). One of John Rachel's company's, RGI, Incorporated, acted as a subcontractor to DMSI on this contract.

5. The Treasury Inspector General for Tax Administration's (TIGTA) investigation revealed that on November 17, 1994, RGI entered into a "Teaming Agreement" with DMSI to cooperate in obtaining and satisfying the IRS contract for computer and maintenance repair. John Rachel is the President of RGI and wholly owns and controls the company. RGI was identified as a subcontractor by DMSI in the documents DMSI submitted to the Government in connection with the MNOMAP contract. The contract had two components: on-site maintenance for all the computer equipment in the IRS facilities in the Washington, D.C. region and nation-wide mail-in repair of computers. Under the terms of the contract, DMSI would service and repair computers for the IRS, billing the IRS for the actual cost of time and materials utilized in making the repairs, plus a fixed mark-up (a Time-and-Materials-type contract).

6. Under the terms of the contract, when an IRS laptop computer needed hinge repairs, it

was mailed or shipped to a location referred to as the "depot." At the depot, RGI and DMSI employees would prepare each computer for repair by removing the screen and any electronics from the laptop cover. John Rachel personally picked up the covers from the depot and delivered them to Technical Design Resources (TDR), which was responsible for manufacturing and installing the hinge repair kits. John Rachel then would personally pick up the covers from TDR after the hinge repair kits were fixed and installed, and return them to the depot, where employees would reassemble the laptops.

      7. Shortly after beginning work on the contract, John Rachel and his wife Priscilla incorporated Computer Specialties of Maryland (CSM). Acting exclusively through John Rachel, CSM began acting as an intermediary between RGI and TDR to satisfy the IRS contract. CSM would obtain the repaired laptops from TDR, and then bill RGI for these services. Priscilla Rachel was identified in corporate documents as the Secretary to CSM. John Rachel was the President of CSM. CSM had no employees and paid no wages or salaries during its existence. CSM's financial records were maintained by John Rachel at his residence or at the offices of RGI. CSM's physical address was RGI's office space located in Glen Burnie, MD. Its mailing address was a post office box. In addition, John Rachel prepared CSM's invoices to RGI on a typewriter in his kitchen.

      8. The investigation determined that TDR invoiced CSM an amount between $23.20 and $26.70 for each hinge repair kit. CSM paid TDR these invoices and then invoiced RGI $117 for the same repair kits. RGI in turn prepared and submitted invoices to DMSI billing them $122.84 for each of the same hinge repair kit. DMSI included the payments to RGI in its invoices to the IRS for payment of services rendered under the contract, billing the IRS $128.99 for each hinge repair kit. The IRS paid these invoices. In November 1997, the IRS terminated the hinge-repair

3

contract with DMSI. Shortly thereafter, CSM ceased operations.

9. On November 29, 2000, the Government filed a civil action in the U.S. District Court, District of Maryland, against John Rachel, Priscilla Rachel, RGI, and CSM. In this lawsuit, the Government alleged that the Defendants violated the False Claims Act, 31 U.S.C. § 3729(a)(2), as well as common law theories of fraud, negligent misrepresentation, breach of contract, payment under mistake of fact, and unjust enrichment. The Government alleged that John and Priscilla Rachel created CSM, a shell corporation, for the purpose of inflating costs and issuing false invoices to RGI which were then used to bill DMSI under the MNOMAP contract. This enabled CSM to make a profit of 300% to 400%, which the Government alleged violated the provision of the Civil False Claims Act.

10. On July 10, 2003, Judge Nickerson granted the Government's motion for summary judgment, determining that the Defendants had violated the False Claims Act. In its opinion, the Court concluded, "with little difficulty, that the CSM markup of the invoice was fraudulent." CSM had no employees, paid no wages during its existence, and used the same physical address as RGI. CSM and RGI were owned and controlled by the same person(s).

11. On February 13, 2003, after abortive settlement discussions between the parties, this Court set a schedule for briefing of the issues of damages, which the parties have agreed are largely a mathematical computation. This declaration is submitted in support of the government's Motion for Summary Judgment on Damages.

12. On October 28, 2003, your affiant reviewed a spreadsheet (Exhibit A to the Declaration of Special Agent Douglas Luzier) prepared by Special Agent Luzier and auditor Randy Gregory, Treasury Inspector General for Tax Administration (the "Summary Spreadsheet"). Special Agent Luzier has been involved with this investigation in the capacity as

4

both an auditor and an agent. The Summary Spreadsheet was a schedule of "invoices" relative to the Hinge Repair Kits on the MNOMAP contract. It included TDR invoices to RGI/CSM, CSM invoices to RGI, RGI invoices to DMSI, and DMSI invoices to the IRS, as well as the payments associated with these invoices.

     13. The Summary Spreadsheet essentially summarizes the complete set of the invoices and payments set forth therein. A set of these documents was provided free of charge to defense counsel Ed Tolchin during discovery in this matter. I personally prepared additional copies which are being sent to Mr. Tolchin and filed with the government's Motion for Summary Judgment as Exhibit B to Special Agent Luzier's Declaration.

     14. During the deposition of Special Agent Luzier on December 18, 2002, government counsel reviewed a complete contract "cycle" and had the agent construct a partial spreadsheet similar to the one ultimately produced as Exhibit A. That represented one complete series of invoices from TDR to CMS to RGI to DMSI to the IRS, and one complete series of payments for those invoices, flowing from the IRS to DMSI to RGI to CSM to TDR. The transcript for this deposition, along with the relevant documents, including invoices, checks and the draft spreadsheet, were previously submitted with the government's Motion for Summary Judgment on liability issues, and are resubmitted as Exhibit C to Special Agent Luzier's Declaration for the convenience of the Court.

     15. As set forth in the Summary Spreadsheet, there were 26 invoices requesting payment that were submitted by DMSI to the Internal Revenue Service, an agency within the U.S. Department of Treasury. Included in these invoices were services by RGI/CSM and TDR for the Hinge Repair Kits. The DMSI invoices included the amounts invoiced to them from RGI, CSM, and TDR. DMSI paid RGI $643,365 for the Hinge Repair Kits. RGI/CSM paid TDR an amount

5

of $132,971 for their services on the Hinge Repair Kits.

16. When this case was evaluated for prosecution it was determined that certain of the invoices were submitted outside of the statute of limitations. The complaint was filed March 11, 2002. As a result, four of the 26 invoices to the IRS must be excluded from the analysis. These are set forth on the first two pages of the Summary Spreadsheet (Exhibit A, pages 1/2 and 3/4). This brings the number of false claims to the IRS down to 22.

17. In addition, in order to calculate the overpayment or fraud to RGI/CSM, credit must be given for an allowable General & Administrative (G&A) cost, or mark-up cost, by each company. Since the contract allowed a 5 percent markup, that is what should be applied in this case.

18. After making these two adjustments, the total single damages in this case can be computed easily. I have prepared a chart showing these computations. It is attached hereto as Exhibit D.

19. As set forth in Exhibit D, first one must compute the amount actually paid from DMSI to RGI for IRS invoices with the statute of limitation period. Overall payments (for hinge repairs only) actually made to RGI by DMSI are set forth on page 37 of the Summary Spreadsheet and total $643,365.45. Of these, $119,041.65 are beyond the statute of limitations, as set forth on pages 1/2 and 3/4 of the Summary Spreadsheet. This leaves $524,323.80 as the total payments made by DMSI for fraudulent invoices.

20. In order to give RGI credit for actual expenses related to the hinge kit repairs, we have to identify what was paid by CSM/RGI to TDR. This amount, $132,971.48, is reflected on page 37 of the Summary Spreadsheet. Of this amount, $22,642.88 reflects payments for invoices outside the statute of limitations, as set forth on pages 1/2 and 3/4 of the Summary Spreadsheet.

This leaves $110,328.60 as the total payments made by CSM or RGI to TDR for hinge repairs.

21. When you subtract the amount actually paid by CSM or RGI to TDR for hinge repairs from the amount paid to RGI by DMSI for hinge repairs, you get the amount by which RGI's invoices were fraudulently inflated, or $413,995.20

22. This does not, however, represent all that the IRS was overbilled. DMSI charged its contract markup of five percent on the fraudulent amounts, which further inflated the billings to the IRS. By adjusting for this five percent markup ($20,699.76), you get the total amount of single damages in this case, or $434,694.96.

23. Given the extreme and blatant nature of this fraud, the United States is seeking triple damages under the False Claims Act. This would result in overall damages of $1,304,084.88.

24. In addition, there were a total of 22 invoice submitted by DMSI to the IRS which contained inflated hinge repair expenses. As the Court found in its decision granting the government summary judgment on damages, these false invoices to the IRS were caused by the conduct of the defendants. The United States is seeking the stautory penalty of $10,000 per invoice, for $220,000.00 in total penalties.

25. All together, the United States has established a total of statutory triple damages and statutory penalties totaling $1,524,084.88.

I declare that under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

                                  William Harry Armstrong
_____
                                Assistant Special Agent In Charge William Harry Armstrong