UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED SATES OF AMERICA : | |
| : | |
|     Plaintiff, : | |
| : | |
| v. : | WMN 02 CV 754 |
| : | |
| JOHN RACHEL, et al. : | |
| : | |
|     Defendants. : | |

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT ON DAMAGES AND MEMORANDUM IN SUPPORT OF DEFENDANTS'
CROSS MOTION FOR SUMMARY JUDGMENT ON DAMAGES

**Introduction**

Plaintiff The United States filed a complaint in this matter which, in Counts I, II, and III, alleged that Defendants submitted false claims to the United States. The Government's theory is set forth in it Complaint as follows:

    1. "Diez Management Systems, Inc. ('DMSI') [contracted] with the Internal Revenue Service to supply computer maintenance and repair services on a time and materials ('T&M') basis." Complaint at ¶ 9.

    2. "Pursuant to the Federal Acquisition Regulations ('FAR') specifically 48 C.F.R. § 16.601, a T&M contract 'provides for acquiring supplies or services on the basis of . . . materials at cost, including, if appropriate, material handling costs as part of material costs.'" Complaint at ¶ 11.

3. "According to the FAR and the terms of the Contract, DMSI and RGI were required to charge the government for . . . [m]aterials . . . . at cost." Complaint at ¶ 13.

4. "The hinges [at issue] were designed, manufactured, and installed by [Technical Design Resources or 'TDR'] at a cost of approximately $23.00 per hinge." Complaint at ¶ 16.

5. Defendants "invoiced DMSI $122.85 for the repairs" and "[u]ltimately DMSI invoiced IRS $128.99 for the repairs which had been performed by TDR for $23.20." Complaint at ¶ 20.[1]   6. To the extent that Defendants' billings to DMSI exceeded TDR's charges ($23.20 -$26.70), they constitute "illegal and fraudulent inflated costs." Complaint at ¶ 22.

We have pointed out to the Court on several occasions that the Government's theory is illegitimate because nothing anywhere – neither "the FAR and the terms of the Contract" (Complaint at ¶ 13) – restricted Defendants[2] to passing on only TDR's charges, or for that matter, to passing on only direct or even indirect costs, without profit. Defendants had every legal right to, and did in fact, fix price its hinge repair kits, which were commercial items developed at Defendants' expense and risk, at $122.85, establishing the price based on direct costs, indirect costs, desired profit, intangibles, competition, and estimates of risks. *See* Declaration of John Rachel (attached as Exhibit 1 hereto) ("Rachel Dec.") at ¶s 1-3. Defendants used co-defendant CSM to provide the warranty because they thought it would protect RGI from the exposure to the potential cost risks. Deposition of John Rachel ("Rachel Dep.") at pp. 128-

---

[1] The Government now allows that TDR did not charge $23.20, but rather charged different amounts for different shipments, ranging up to $26.70. *See* Armstrong Declaration at ¶ 8 (attached to Government Motion for Summary Judgment on Damages).

[2] We refer to all Defendants collectively, without admission of liability, except as specifically noted, based on the Court's July 10, 2003 liability decision which suggests that all the Defendants are jointly and severally liable.

131, 162-164, 167-168.

The Court already, however, has ruled in its July 10, 2003 liability decision that Defendants caused DMSI to submit a false claim because DMSI passed on the allegedly "inflated costs." July 10, 2003 Liability Decision, Slip Op. at 17. The Court's July 10 decision cites no provision of "the FAR and the terms of the Contract" (Complaint at ¶ 13) which prevented Defendants from charging anything it wanted to DMSI, or prevented DMSI from passing on the prices it paid to Defendants, regardless of what the prices were or how Defendants calculated them. The Court's citation to evidence on DMSI's alleged obligation with respect to passing on to the Government the prices charged by Defendants is only a citation to the Government's Motion, *see* Slip Op. at 17, which also cited no provision of "the FAR and the terms of the Contract" (Complaint at ¶ 13) to support this theory. *See* Government's Mot. at 17-18 (cited by the Court at Slip Op. at p. 17).[3]

We also note that the Court's July 10 Decision states that its conclusion on Defendants' liability for making DMSI supposedly overcharge the Government is made "without reference to the Contract or the Federal Acquisition Regulations (FAR)." *See* Slip Op. at 17. However, as there is no reference to a contract or FAR clause, **nothing** now defines what Defendants could charge DMSI. The Court's conclusion, therefore, is inconsistent with finding that Defendants

---

[3] The Government's Motion (Govt. Motion at pp. 17-18) and the Court's decision (Slip Op. at pp. 17-18) cite the general legal principle that FCA liability can be imposed if one company causes another to submit a false claim. We do not object to that statement of law, but the statement of law does not obviate the need to identify a provision of "the FAR [or] the terms of the Contract" (Complaint at ¶ 13) which prohibits DMSI from passing on the Defendants' price. Absent such provision or term, DMSI has not submitted a false claim and the Defendants, therefore, have not caused a false claim to be submitted. Here, the Government, to date, has failed to cite any FAR provision or contract clause which precluded DMSI from passing on Defendant's price.

inflated anything, as there is no baseline from which to calculate an inflation if there is no contract or FAR clause which defines the allegedly *proper* price.  The Court's conclusion also is inconsistent with the Government's argument underpinning its entire case that "[a]ccording to the FAR and the terms of the Contract, DMSI *and RGI* were required to charge the government for . . . [m]aterials . . . . at cost," Complaint at ¶ 13 (emphasis supplied), or as stated elsewhere by the Government, "the defendants were required to comply with the pricing terms of the [SBA/DMSI/IRS] Contract."  *See* Government Motion dated January 22, 2003 at p. 20.   Stated succinctly, if nothing – no "Contract or . . . FAR" clause -- constrained Defendants' charges, there cannot be an improper inflation of costs – the logic of which even the Government recognized in its Complaint and Motion for Summary Judgment as to Liability (filed January 22, 2003).

The Court's analysis is nevertheless the basis of its summary judgment on liability, and we must start from this foundation to construct a damages calculation in this aspect of the proceeding.   We do so below, without admission of any liability.

      A.     **The Government Uses the Wrong Single Damages Formula; The Correct Formula to Determine Single Damages is to Calculate the Difference Between What The Government Paid Defendants and a $103 per Unit Cost, Which Results in Single Damages of $ 97,854.99, and Not $ 434,696.36**

Given the Government's allegations and the Court's July 10 Decision on liability, the Government's damages are not the difference between the amount the Government paid and the amount payable under the Government's pricing formula, as the Government contends.  That amount cannot be a reasonable computation of damages because it is undisputed and undisputable that the Defendants never would have developed and sold the repair product to the Government at their out of pocket manufacturing cost. *See* Rachel Dec. at ¶ 2.  No business

operates in such a manner or, if it does, it does not operate for more than a couple of days or weeks.

Stated succinctly, it is undisputed here that, in the absence of Defendants' alleged fraud, Defendants would not have sold the kits to DMSI for resale to the IRS because Defendants would not have developed and sold the product, and incurred the risks of such a venture, for no return and no compensation for risk. Rachel Dec. at ¶ 2. The Government's alternative to Defendants was Defendants' competitor. Thus, while the Government's damages in this case consist of the difference between (a) what the Government paid due to the claimed fraud, and (b) what the Government would have paid in the absence of the claimed fraud, the second portion of that calculation is the market price for the alternative to Defendants' product purchased from a competitor, not what the Government calculates in its Motion. *See United States v. Bornstein*, 423 U.S. 303 (1976); *Brown v United States,* 207 Ct Cl 768, 524 F.2d 693 (1975); *P.E.C. Corp.*, Govt. Contracts Rptr, ( CCH) ¶ 84,171 (Ct. Cl. 1975); *United States v. Aerodex, Inc.*, 469 F.2d 1003, 1007 (5th Cir. 1972); *United States v. Ben Grunstein & Sons Co.*, 137 F. Supp. 197 (D.N.J. 1955).

The Government, which has the burden of proof as to damages, presents no evidence of what it would have paid to a competitor. The evidence, however, is in the record. Specifically, it is undisputed that, in the absence of Defendants' invention of the hinge repair kit, there was only one other source available in 1996 – the prior contractor, a company known as Metrica. The Government would have paid approximately $103 per hinge repair to that vendor as that was the amount the vendor charged for its hinge repair kits. Rachel Dec. at ¶s 1 and 4; Watona Dep. at pp. 13-16, 20 (Exhibit 3 hereto) (Metrica charged between $90 and $99 + 7 % or $96.30 -

5

$105.93); Exhibit 4 hereto (Exhibit 21 to Watona Dep.).

We also note that the Metrica price was consistent with the only other entity that offered to supply the repair units during the period at issue towards the end of the supply relationship in 1997. Specifically, the record shows that a month prior to the end of the contract, in or around October 1997, DMSI began buying the repair kits from a company known as Ichiban, who copied RGI's patented repair. Rachel Dep at 55-56, 158. Ichiban initially offered sell the hinge repair kits to DMSI on February 18, 1997, at a price of $ 97.00 per unit, assuming a minimum order of 200 kits per order. A copy of this proposal is attached as Exhibit 8 hereto. Sometime later in 1997, DMSI accepted the proposal, but negotiated a price of $ 94.00 per unit instead of $97.00 per unit. A copy of correspondence Ichiban sent to DMSI regarding this matter with a handwritten note of a confirming conversation with Diez personnel is attached as Exhibit 9. Ichiban shipped the repaired hinge units to Diez beginning in or about October 1997. It initially billed Diez $97 per unit, but then dropped the price to the agreed $ 94.00 per unit.[4] Copies of several invoices from Ichiban to Diez covering these hinge repair kits are attached as Exhibit 11 hereto.

Exhibit A to the Armstrong Declaration (filed with the Government's Motion for Summary Judgment on Liability) reports on page 37/38 that Defendants purchased 5,369 kits from TDR and resold them all to DMSI. Subtracting from this total the 974 kits which preceded the limitations period used by the Government in its calculations (those summarized on pages 1

---

[4] We note that Ichiban's pricing was not only comparable to Defendants, its cost structure was comparable too. In September 1997, Ichiban entered into an agreement with OEC Engineering Corp. for OEC to supply and install the competing hinge repair kits to reinforce the upper plastic case of the IRS' SOTEC laptop computers. The price Ichiban paid OEC per unit was $29.50. A copy of a purchase order to OEC for these kits is attached as Exhibit 10 hereto.

6

and 3 of Exhibit A to the Armstrong Declaration), leaves 4,395 repair kits which Defendants purchased from TDR and resold to DMSI.

The Government's single damages, therefore, using the number of repair kits at issue calculated by Mr. Armstrong and employing the comparable analysis to that attached as Exhibit D to his Declaration, is as follows:

| | |
|---|---|
| Payments from DMSI to RGI | $524,323.80 |
| DMSI's G&A amount (5%) billed to IRS | $ 26,216,19 |
| Amount billed to IRS due to fraud | $550,539.99 |
| Amount IRS would have paid if Fraud did not occur | $452,685.00 (4,395 @ $103 = $452,685) |
| Government Single Damages | $97,854.99 ($550,539.99- $434,694.96) |

Thus, the Government's single damages are $ 97,854.99, not the $ 434,696.36 calculated by the Government. There can be no other basis for calculating damages in this case.

  **B.**  **Even Using The Government's Conceptual Damages Formula, The Correct Single Damages Calculation Is $ 302,624.13 and Not $ 434,696.36**

Even assuming the Government's conceptual damages formula is correct, and it is not, and further assuming that Defendants had no right to fix price the commercial hinge repair kits they developed, which is what actually occurred here, *see* Rachel Dec. at ¶s 1-3, and also assuming that the Court has determined that Defendants have no right to profit, which is implied in the Court's July 10 opinion,[5] then we provide the following corrections to the Government's

---

[5] Once again, these conclusions, which follow directly from the Court's July 10 decision, cannot be reconciled with the statutes and regulations regulating contract law in general or government contract law in particular. No statute, no regulation, and no contract clause precluded Defendants from fix pricing something they sold to DMSI, or from earning a profit on their work. And, by fix pricing a commercial product sold to DMSI, Defendants could not possible cause DMSI to overcharge the Government. But, again, we are starting with the Court's liability decision.

calculations.

### 1. The Government's Single Damages Calculation Understated Defendants' Basic Costs

Using the Government's damages theory, we must first calculate Defendants' "costs" or, otherwise, we cannot even begin to know by what amount the costs were "inflated." Though the Court states that its conclusion concerning Defendants' liability is made "without reference to the [SBA/DMSI/IRS] Contract or the Federal Acquisition Regulations (FAR)," *see* Slip Op. at 17, the Government's calculations presented to this Court now as to what Defendants allegedly *could* charge are based on the SBA/DMSI/IRS contract. So, assuming the Government's single damages formula is correct, despite its inconsistency with the Court's liability decision, we must begin with that contract which states that "in accordance with FAR 16.601, Time and Materials Contract . . . Materials will be reimbursed at cost, including material handling costs." Contract at ¶ B.1 (Exhibit 5 hereto).

In making its calculations of "cost" in the Government's Motion for Summary Judgment as to Liability, the Government allows only direct costs paid to TDR. However, *all* direct costs and *all* indirect costs are allowable in calculating costs. FAR Part 31. Direct costs include such items as the costs of developing a product and prosecuting a patent application and the surrounding rights generated thereby, packaging and delivering products, and estimated costs of warranties. FAR Part 31.205; FAR 46.7. Indirect costs include fringe, overhead and general and administrative costs. FAR 31.201, 31.203. Thus, the costs here are not merely the $110,328.60 paid from RGI/CSM to TDR, as the Government states, but also the following costs, calculated as set forth in the attached Declaration of John Rachel at ¶s 5-7, and the documents attached to that Declaration.

|                                    | 1996         | 1997         |
|------------------------------------|--------------|--------------|
| Development time                   | $3,293.71    | $2,958.46    |
| Pick up and delivery time          | $9,881.13    | $7,810.33    |
| TDR price                          | $65,372.98   | $58,241.75   |
| Patent prosecution and protection  | 0            | $ 6,848.24   |
| Warranty cost estimate             | $37,262.59   | $33,197.80   |
| ANNUAL TOTALS                      | $115,810.42  | $109,056.57  |
| **GRAND TOTAL**                    |              | **$224,866.99** |

Thus, the costs are not $110,328.60, as calculated by the Government, but rather $ 224,866.99.

To anticipate the Government's objection that Defendants are combining CSM and RGI information when CSM purchased the products from TDR and resold them to RGI which resold them to DMSI, we are doing so because the Government is piercing the corporate veil of both CSM and pursues RGI, and piercing the veil of RGI and pursuing John Rachel and Priscilla Rachel. As the Government has treated everything as a single enterprise, the single enterprise's costs are the material inquiry in determining the "cost" of the material which the Court has found that Defendants together inflated.

> **2.  The Government's Single Damages Calculation Failed To Allow Defendants a 5% Handling Charge**

As noted, the Government's case about Defendants' alleged "inflated costs" is based on the SBA/DMSI/IRS contract which, according the Government, permitted RGI to bill its costs plus a "material handling" charge which is described as follows in the SBA/DMSI/IRS contract – "a Materials Handling Charge of 5% will be allowed on materials used." Contract at ¶ B.2.1 (Exhibit.5 hereto). Accordingly, the $ 224,866.99 calculated above must be increased to $ 236,110.34 ($ 224,866.99 + 5 % ) to determine the amount that Defendants could properly bill DMSI under the Government's formula for the case. Indeed, in the liability aspect of this

proceeding, the Government advised the Court that this 5 percent was intended to be Defendants' profit: "[Defendants] extract[ed] a profit of 300 to 400 percent rather than the 5 percent allowed under the Contract." Govt. Mot. at p. 18.

### 3. Application of the Government's Damage Formula Results in $ 302,624.13 in Single Damages

Using the corrected $ 236,110.34 as the costs which Defendants should have passed through, the Government's damages under its own conceptual formula (set forth in Attachment D to the Armstrong Declaration) results in single damages of $ 302,624.13 ($ 524,323.80 - $ 236,110.34) + 5 %), and not $ 434,696.36 as claimed by the Government in its Motion.

### B. Treble Damages and Penalties of $10,000 Per Claim Should Not Be Imposed Against Priscilla Rachel

The False Claims Act, 31 U.S.C. § 3729, provides that a person "is liable to the United States Government for a civil penalty of not less than $ 5,000 and not more than $ 10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person." Because both the treble damages and the civil monetary penalty provided for in the FCA are, at least in part, punitive, this statute must be read in the context of the Eighth Amendment of the United States Constitution which provides that "excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." *See United States v. Mackby,* 339 F.3d 1013 (9th Cir. 2003); *United States v. Byrd*, 100 F. Supp. 2d 342 (E.D.N.C. 2000); *United States v. Advanced Tool Company*, 92 F. Supp. 1011 (W.D. Mo. 1995).

The inquiry required to assess Constitutional excessiveness is that set forth by the United States Supreme Court in *United States v. Bajakajian*, 524 U.S. 321, 334 (1998): is the proposed

payment "grossly disproportional to the gravity of a defendant's offense."[6]  As explained in *Byrd*:

> In an unpublished 1995 opinion, the Fourth Circuit Court of Appeals noted that "the Supreme Court has provided no guidance as to what an excessive fine might be, although fines must be carefully scrutinized because they benefit the government." *U.S. v. Hicks*, 46 F.3d 1128 (4th Cir., 1995).   Since that time, however, the Supreme Court has issued a decision pertaining to the Excessive Fines Clause.  In analyzing the applicability of the Clause to a forfeiture case, the Court cautioned that "judgment about the appropriate punishment for an offense belong in the first instance to the legislature ... any judicial determination regarding the gravity of a particular criminal offense will be inherently imprecise."  *United States v. Bajakajian*, 524 U.S. 321, 118 S. Ct. 2028, 2030-1, 141 L. Ed. 2d 314 (1998). Nonetheless, the Court stated that: "until today ... we have not articulated a standard for determining whether a punitive forfeiture is constitutionally excessive. We now hold that "a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *Bajakajian*, 524 U.S. at 334, 118 S. Ct. at 2036.

*Id.*, 100 F. Supp. 2d at 344-45.

Thus, in *Bajakajian*, the Supreme Court established that "a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *Id.*, 524 U.S. at 334.  In that case, Bajakajian had attempted to leave the country with $ 357,144 in legally obtained currency.  He pled guilty to failing to report that he was transporting more than $10,000 out of the United States, as required by 31 U.S.C. § 5316(a)(1)(A).  *Id.*, 524 U.S. at 325.  The district court imposed three years of probation and a $ 5000 fine, and concluded that the full $357,144 was subject to criminal forfeiture.  The district court, however, found that full

---

[6] *Bajakajian* did not deal with a civil sanction but rather with the criminal forfeiture of property involved in the unreported transportation of over $ 10,000 in currency out of the country.   However, prior to *Bajakajian*, the Supreme Court held that civil fines fall within the scope of the Eighth Amendment. *See Hudson v. United States*, 522 U.S. 93, 103 (1997) ("The Eighth Amendment protects against excessive civil fines, including forfeitures.") (citing *Alexander v. United States*, 509 U.S. 544 (1993) and *Austin v. United States*, 509 U.S. 602 (1993)).  Consequently, the *Bajakajian* analysis is applied to both civil and criminal penalty issues, and specifically to the False Claims Act civil penalty provisions.  *Mackby, supra; Byrd, supra.*

forfeiture would have been "extraordinarily harsh" and "grossly disproportionate" to the offense, and it ordered a forfeiture of $15,000 in addition to the fine and probation. *Id*., 524 U.S. at 326.

The government appealed, and the Supreme Court held that forfeiture of the full amount violated the Eighth Amendment's ban on excessive fines. The Court then considered the severity of Bajakajian's offense and its relation to other criminal activity, the maximum criminal penalty he faced, and the harm he caused. *Id*., 524 U.S. at 337-39. It used these considerations to weigh the gravity of the crime against the amount of the forfeiture and concluded that a $357,144 forfeiture was grossly disproportional to the gravity of the offense and therefore unconstitutional. *Id*., 524 U.S. at 339-40.

*Bajakajian* does not mandate the consideration of any rigid set of factors in deciding whether a punitive fine is "grossly disproportional to the gravity of a defendant's offense." That case and others, however, have looked at the following: the harm caused, the presence or absence of related illegal activity, the defendant's level of culpability, and other punishments which are imposed. *See Mackby, supra.* Here, it is clear that imposition of treble damages and any per-claim penalty on Priscilla Rachel is "grossly disproportional to the gravity of" her involvement in this matter.

During all times relevant to the issues in this case, defendant Priscilla Rachel had no ownership interests in co-defendants RGI or CSM, and she performed no services for either company. She worked full time as a nurse in a hospital. Furthermore, the government admits that she was not an owner, officer, director or employee of RGI at the time of the alleged frauds. Admission Response 7 attached as Exhibit 6 hereto. And, while Mrs. Rachel nominally served on RGI's Board of Directors for at least part of the 1990s, the board rarely if ever met and she

had nothing to do with RGI's work.  She knew that her husband, co-defendant John Rachel, had signed her names to various documents, but did not see the specific documents or know what he signed until long after the fact.  Mr. Rachel did not have specific consent to sign Mrs. Rachel's name on anything; he only had general consent resulting from their long and close spousal relationship.  See Rachel Dec. at ¶ 8; Deposition of Priscilla Rachel (attached as Exhibit 7 hereto); Deposition of John Rachel, at pp. 59-61, 65-66 (attached as Exhibit 2 hereto).

To be sure, the Court held that Mrs. Rachel acted recklessly because she "had obligations with respect to performance of her duties" as a board member of RGI and allowed her husband to use her name on corporate documents, Slip Op. at p. 16, but certainly her culpability does not rise to the level of the other Defendants.  Moreover, nowhere is there evidence that she controlled RGI's board of directors, or that she had anything to do with RGI's actual work.  Nor is there any evidence that she controlled her husband, or that he even told her what he was doing.  The evidence is undisputed that John Rachel controlled everything, and told Mrs. Rachel nothing.  The only culprit here, if there is any, is John Rachel.  *See* Rachel Dec. at ¶ 8; Priscilla Rachel Dep. (Exhibit 7 hereto).

In these circumstances, Mrs. Rachel's level of culpability plainly pales compared to the other defendants', and it would violate the Constitution to penalize Mrs. Rachel for being nothing more than a wife.  In fact, the Government's own brief in this matter states it quite succinctly: CSM "act[ed] exclusively through John Rachel . . . as an intermediary" which inflated TDR's charges.  Govt. Motion (filed February 27, 2004) at p. 3.   Moreover, there is no evidence of any other bad acts by Mrs. Rachel, who has spent years as a dedicated full time nurse.  Furthermore, imposition here of single damages is sufficiently devastating to Mrs.

Rachel.  She is a nurse, and it will take years for her to pay off even single damages on a nurse's salary.

Accordingly, the Court should not impose any penalty or treble damages on Mrs. Rachel. Any other decision would violate the Excessive Fines clause of the Constitution.

### C. Penalties of $5,000, not $10,000, Per Claim Should Be Imposed

The False Claims Act, 31, U.S.C. § 3729(a), provides that a person "is liable to the United States Government for a civil penalty of not less than $ 5,000 and not more than $ 10,000 . . . ."  The Government states no legitimate reason to impose the high end of this penalty in this case.  This case involves Mr. Rachel's determination that he had a right to sell this product, which he invented, as a commercial product.  He charged a price consistent with the price that his competitor was charging for its product which was inferior to that which he invented.  There is no bad faith here.  There is a dispute about a contract and regulation and how they apply to the facts of this case, nothing more.  In these circumstances, a penalty in excess of $5,000 is inappropriate.

### Conclusion

For the foregoing reasons, the Court should impose the following judgments on the Defendants, if it is to impose any judgments whatsoever: RGI – $ 403,564.97 ($ 97,854.99 x 3 +

(22 x $5,000)); CSM – $ 403,564.97; John Rachel – $ 403,564.97; Priscilla Rachel – $ 97,854.99.

                Respectfully submitted,

                S/Edward J. Tolchin_____
                Edward J. Tolchin
                Fettmann, Tolchin & Majors, P.C.
                10509 Judicial Drive, Suite 300
                Fairfax, VA 22030
                703-385-9500
                703-385-9893 (facsimile)
                etolchin@ftm-pc.com
                Counsel for Defendants

**Certificate of Service**

      I hereby certify that on this 18th day of March 2004, I filed the Defendants' Opposition to Plaintiff's Motion for Summary Judgment on Damages and Memorandum in Support of Defendants' Cross-Motion for Summary Judgment on Damages, with all exhibits thereto, via first class mail, postage prepaid, on: Tamera L. Fine, Assistant United States Attorney, 6625 United States Courthouse, 101 W. Lombard Street, Baltimore, Maryland 21401. I also filed the aforementioned pleading electronically with the Court and served a copy by the same means on all counsel of record.

                S/Edward J. Tolchin_____
                Edward J. Tolchin