IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
|     Plaintiff | : |
| |     Case No. WMN-02-754 |
| v. | : |
| JOHN RACHEL, et al. | : |
|     Defendant | |

...oOo...

**PLAINTIFF'S RESPONSE TO CROSS-MOTION FOR SUMMARY JUDGMENT ON DAMAGES AND REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON DAMAGES**

The United States of America, by and through its counsel Thomas M. DiBiagio, United States Attorney for the District of Maryland, and Tamera L. Fine, Assistant United States Attorney for said district, hereby submits this Memorandum of Law in response to the defendants' cross-motion for summary judgment on damages and in further support of its Motion for Summary Judgment on Damages.[1]

Defendants use their memorandum to repeatedly challenge and criticize this Court's decision granting the government summary judgment on liability under the False Claims Act. Because the government obviously believes that the Court's decision granting it summary judgment on its False Claims Act claims was correctly reasoned and decided, and because a review of its correctness is more appropriately addressed in an appeal of that decision, if one is taken, the United States does not address these issues in substance.

---

[1] The United States received electronic notification of the cross-motion on the date it was filed. The service copy, with the essential attachments not available electronically, were not delivered to the United States Attorney's Office until March 29, 2004, and were not received by government counsel until April 1, 2004, despite bearing a postage meter date of March 18, 2004.

Defendants also claim that the United States used the wrong measure of damages, arguing that instead it must measure damages as the difference between what the government paid for the hinge repair kits and what it would have paid if it had purchased them from defendants' competitor. This is simply not an appropriate measure of damages, for many reasons. First, as the cases cited by the defendants themselves make clear, resort to a market measure of this sort is only appropriate in cases where it is necessary to determine what sort of "credit" to give a defendant for partial performance, i.e., the delivery of shoddy or substandard good. There one must determine the "market" value of the goods actually delivered. In contrast, this case is one like *Feeser, Inc. v. American Can Co.*, 2 F.Supp. 561, 569 (D. Md. 1932), in which the proper measure of damages is the difference between what the government paid for the goods and what it would have paid but for the fraud. The record in this case is clear that "but for" the defendants' fraud, the government would have paid the cost of the TDR invoices plus a five percent markup, as set forth in the government's computations submitted with its Motion for Summary Judgment on Damages.

Nor can Rachel avoid damages by claiming he would not have even designed the hinge repair kit if he thought he could not recover his investment in development of the hinge repair kit, which amounts to less than $12,000 overall, including his own time ($2,500 for 100 hours at $25 per hour)and his legal expenses ($9,267.86) (See Exhibit 1 to defendants' cross motion). An experienced government contractor, Rachel understood that the five percent handling fee was intended to compensate defendants for their contribution to contract performance, and that he was limited to this amount. His creation of CSM, a shell company created and utilized

exclusively to defraud the government under this contract, belies his claim that he was entitled to recover his development costs, which were minimal indeed.

Finally, having engaged in an elaborate scheme to defraud the government and having been caught in the act of that fraud, Rachel and the other defendants cannot claim that they are somehow innocent victims who wouldn't have even agreed to serve as subcontractors or venders if they thought they wouldn't be allowed to soak the government under the contract. What defendants are really saying are that they ought to be allowed to keep the fruits of their fraud just because they claim, without any support other than their own bald allegations, that they wouldn't have played the game if they had known they wouldn't be allowed to cheat. If the government is not permitted to recover the difference between what the defendants charged under the contract and what they were allowed to charge without the fraud, then the defendants will keep a significant percentage of their ill-gotten gains, rewarding them for their misconduct.

Defendants also claim that they had additional "costs" which must be taken into account in determining what they could have charged under the contract if they hadn't, instead, blatantly defrauded the government. This is rubbish. Again, defendants rehash their argument during the liability phase, claiming that they are entitled to warranty costs as well as a plethora of additional costs. But, as defendants well knew and know, this was a time and materials contact, and it is clear, certainly to an experienced government contract, that the five-percent "handling fee" they were permitted to take under the contract was the absolute limit on "indirect costs" allowed. Similarly, warranty costs had to be specifically enumerated, documented, and agreed to in order to be allowed. Defendants do not claim they complied with any of these requirements. Further, their claim that these were allowed is directly belied by the lengths they took to disguise their

grossly inflated invoices. Such subterfuge was unnecessary if defendants truly believed such "costs" (or cost estimates, in the case of the "warranty") were allowed.

Defendants claim they should be permitted to take their five percent markup on the TDR invoices. The government does not believe it is appropriate to pay a five percent fee to defendants whose principal activity under the contract consisted of falsifying invoices and setting up a corporate web to hide their fraud. RGI and CSM were entirely unnecessary "middlemen" in the performance of the MNOMAP contract. TDR manufactured and installed the hinge repair kits, and DMSI handled the bulk of the disassembly and reassembly of the laptops, as well as all contract administration. Their five percent markup was already allowed in the government's computations.

Next, defendants make the unusual argument that Priscilla Rachel, despite having been found liable under the False Claims Act by this Court, should not be subject to the statutory punishment because it would be "cruel and unusual." Relying on forfeiture cases where large amounts of cash were seized for relatively small infractions, defendants argue that Priscilla Rachel is only a minor participant in the massive fraud, again directly contradicting and challenging the Court prior decision.

First, of course, Priscilla Rachel participated in and facilitated 100 percent of the fraud in this case. Having been found liable, Priscilla Rachel cannot escape the plain language of the False Claims Act, which does not allow damages to be reduced in the manner urged by defendants. The False Claims Act provides, in relevant part, as follows:

§ 3729. False claims

(a) Liability for certain acts.--Any person who--

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
>
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
>
> (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . .

It is clear that the statute mandates the amount of damages, although it leaves the Court some flexibility in the amount of penalties assessed. These are civil damages, not "punishment" which might be subject to the restrictions of the Eighth Amendment. Further, it is clear from the Court's prior decision that Priscilla Rachel facilitated this fraud and that without her willingness to allow her husband to transact business in her name and her abdication of her responsibilities as an officer and director, this fraud would not have occurred. The damages and civil penalties provided for by the False Claims Act are entirely reasonable under the facts of this case.

In addition, it is also clear that only damages imposed on Priscilla Rachel as well as the other defendants, can be collected. Assets have been transferred from John to Priscilla Rachel (for example, RGI), rendering any judgment which does not include Priscilla Rachel uncollectible. If a lesser amount of damages is imposed against Priscilla Rachel, the defendants will, collectively, successfully retain fruits of their wrongdoing. This cannot be allowed to happen.

Finally, defendants claim that the Court should impose the smallest amount of penalties allowed by statute. In light of this Court's finding "without difficulty" that the defendants had engaged in fraud, and in light of the sophisticated and intricate means used to perpetrate this fraud, there is every reasons to impose the largest possible penalty rather than the smallest.

## CONCLUSION

Again, this case is not one in which the defendants have simply failed to "turn square corners" with regard to government contracting. *United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 302 (6h Cir. 1998) Defendants – including Priscella Rachel – successfully set up a scheme, using a shell corporation and fraudulent invoices cooked up at the kitchen table, to systematically overcharge the government between 300 and 400 percent of the cost of a part. Their claims that they thought they were entitled to charge this much are entirely betrayed by the convoluted and complex scheme they perpetrated to hide these charges. Accordingly, the United States respectfully asks this Court to enter Judgment in favor of the United States for $1,304,084.88 in triple damages, $220,000.00 in statutory penalties, post judgment interest at the rate established by law, and for such other and further relief as this Court deems just and proper.

April 5, 2004

Respectfully submitted,

Thomas M. DiBiagio
United States Attorney

   /s/ Tamera L. Fine
Tamera L. Fine
Assistant United States Attorney
6625 United States Courthouse
101 West Lombard Street
Baltimore, Maryland 21201-2692
410-209-4806