IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : Civil No. WMN-02-754 |
| | : |
| JOHN RACHEL, <u>et al.</u> | : |

**MEMORANDUM**

Before the Court are The United States of America's Motion for Summary Judgment on Damages and Defendants' Opposition.  Papers No. 47, 48.  The motions are briefed and ripe for decision.  Upon a review of the pleadings and the applicable case law, the Court determines that no hearing is necessary (Local Rule 105.6) and that judgment will be granted in favor of the government in the amount of $1,506,708.10.

In its Memorandum and Order of July 10, 2003, this Court granted the government partial summary judgment finding Defendants John Rachel, Priscilla Rachel, RGI, Inc. ("RGI"), and Computer Specialties of Maryland, Inc. ("CSM") liable for fraudulent conduct that violated the False Claims Act ("FCA"), 31 U.S.C. § 3729.  Papers No. 32, 33.  The parties' subsequent settlement discussions on damages failed to produce a resolution.

The relevant background facts of the case are detailed in

the Court's Memorandum and will not be repeated here in their entirety.  See Paper No. 32.  Defendant John Rachel wholly owned and controlled both Defendants RGI and CSM.  His wife, Priscilla Rachel, sat on the Board of Directors of each company.  RGI acted as a subcontractor on a deal between the IRS and Diez Management Systems, Inc. ("DMSI") to repair laptop computers.  RGI subcontracted with Technical Design Resources, Inc. ("TDR") for the repairs.  CSM was a shell corporation created to act as a middleman between TDR and RGI; it vastly inflated its costs to legitimize the prices RGI charged DMSI.

When assessing damages caused by fraudulent overpricing under the FCA, courts look to ascertain "the difference between the reasonable cost of the goods sold and the price the government actually paid for the goods . . . ."  United States v. Aerodex, 469 F.2d 1003, 1010 (5th Cir. 1973) (citations omitted).  Where the defendant's fraud prevents a precise calculation of the damages, the factfinder "may make a just and reasonable estimate of the damage based on the relevant data . . . . [T]he wrongdoer shall bear the risk of uncertainty which his own wrong has created."  Bigelow v. RKO Radio Pictures, 327 U.S. 251, 265 (1946) (citations omitted).

The government computes its damages by finding the

difference between what it was charged by the prime contractor, DMSI, and what it asserts it would have been charged had Defendants not engaged in fraud. After eliminating the claims that fall outside the statute of limitations, the government adds five percent to the remaining figure to account for the five percent markup that DMSI properly charged to the IRS. This figure, $434,694.96, is then trebled pursuant to the damages provision of 37 U.S.C. § 3729 to arrive at $1,304,084.88. Finally, the government uses the 22 invoices DMSI submitted to the IRS as the basis for 22 civil penalties of $10,000 each ($220,000) for a final requested award of $1,524,084.88.

The Court agrees with the majority of the government's reasoning, but concludes that it slightly overstates its damages. Within the proper limitations period, DMSI paid Defendants $524,323.80; of this, Defendants paid $110,328.60 to subcontractor TDR. Aff. S.A. Armstrong ¶ 19. Characterizing Defendants as "entirely unnecessary 'middlemen,'" (Plaintiff's Reply at 4) the government considers the entire $413,995.20 difference to be fraudulently obtained. Had Defendant John Rachel been honest in his dealings, he presumably still would have been involved in the performance of the MNOMAP contract, transporting materials

3

from "the depot" to TDR and returning the finished product to DMSI. By doing so, he legitimately would have been entitled to some compensation. This is not factored into the government's calculation of its damages.

In the absence of a clear contractual arrangement between the government and subcontractor Defendants, the Court looks to the government's contract with the prime contractor, DMSI, to arrive at a just and reasonable estimate of what Defendants would have been paid in the absence of fraud. The IRS paid DMSI its costs plus five percent; the Court finds it just and reasonable that Defendants would have been paid the same. Defendants paid TDR $110,328.60 and would have been reasonable in charging DMSI five percent ($5,516.43) for their services. This leaves a $408,478.77 difference between what Defendants actually charged DMSI and what it would have charged under the Court's model. Adding the five percent markup that DMSI passed on to the IRS, the Court finds that Defendants caused $428,902.71 in damages to the government. Because 31 U.S.C. § 3729(a) mandates treble damages, the award becomes $1,286,708.10.

In addition to treble damages, the False Claims Act calls for a "civil penalty of not less than $5,000 and not more than $10,000" for each prohibited act. The Court accepts the

4

government's request to impose the high-end penalty of $10,000 because the government only seeks recovery for each of the 22 tainted invoices that DMSI submitted to the IRS.[1]  Because the government has not made demands beyond 22 false claims and the serious nature of Defendants' fraudulent activity, the Court finds Defendants liable for $220,000 in additional civil penalties ($10,000 for each of the 22 claims).

The total award is  $1,506,708.10.

In their memorandum Defendants first dispute this Court's July 10, 2003 decision finding them liable for violating the FCA.  They reiterate their arguments that they were not bound by the terms of the contract between DMSI and the IRS and that they could not have inflated prices because "**nothing** now defines what Defendants could charge DMSI."  Def. Motion at 3 (emphasis in original).  Beyond pointing out that Defendants' logic creates a pricing scheme where Defendants can charge the

---

[1] The government acknowledges it takes a conservative approach in only requesting relief for 22 violations.  The record shows that DMSI submitted 22 tainted invoices (that are not time-barred) to the IRS.  Defendants submitted many more invoices to DMSI and the government could have sought compensation for each of these violations, instead.  See United States v. Bornstein, 423 U.S. 303, 312 (1976) (reversing appellate court that penalized liable subcontractor based on the number of tainted claims prime contractor submitted to government and not, as it should have, on the number of fraudulent invoices submitted by subcontractor, reasoning that "the [FCA], in short, penalizes a person for his own acts, not for the acts of someone else").

government absolutely any amount they wish as long as they attach a cost label to it, the Court will direct Defendants to its earlier opinion and the appellate process.

Defendants also argue that the government's damages formula vastly understates Defendants' direct costs by only looking at the amount Defendants paid TDR and by failing to allow Defendants a five percent handling fee.  They submit their own accounting of direct and indirect costs that includes: product development, patent application and rights, packaging and delivery, warranties, fringe, overhead, and general administrative costs.  In the face of Defendants' serious fraudulent acts against the government, the Court uses the payment terms agreed upon by DMSI and the IRS as a default model, supra at 3-4, of what is just and reasonable compensation for Defendants.  The Court has reduced the government's requested award by allowing Defendants to collect a five percent fee ($5,516.43) on its expenditure to TDR.

Defendants also argue unpersuasively that the damages and civil penalties are unconstitutional as applied to Priscilla Rachel.  The Supreme Court holds that "a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense.  U.S. v. Bajakajian, 524 U.S. 321, 334 (1998).  The facts of

Bajakajian are clearly distinguishable.  Bajakajian attempted to leave the country with $357,144 in legally obtained currency that he intended to use for a lawful purpose.  He pled guilty to failing to report a sum greater than $10,000 as required by federal law.  The government attempted to seize the entire amount as a criminal forfeiture.  Id. at 324-25.  The Supreme Court found that such a fine would be grossly excessive to the offense of non-reporting, noting that the law was intended to catch money launderers, drug smugglers, and tax evaders.  Id. at 338.

   The facts here show that this Court has already found Priscilla Rachel liable for violating the FCA.  It found that she "acted at least in reckless disregard of the truth or falsity of the information being submitted by CSM to RGI and eventually to the IRS."  Slip Op. at 16.  Specifically, she had duties as a board member of RGI and as an incorporator, officer, and director of CSM, the corporation with no payroll or employees and whose invoices were typed on Priscilla's kitchen table.  Priscilla knowingly allowed her husband to use her name and identity to conduct business and stood to gain personally from his fraudulent action.  Defendants' scheme netted $408,478.77 (above the cost plus five percent model) within the statutory period.  Unlike Bajakajian, Priscilla

Rachel is the type of person whom the relevant statute intended to target.  The FCA seeks to fine those who act "in reckless disregard of the truth or falsity of information." 31 U.S.C. § 3729(b)(3).  A judgment that holds all Defendants jointly and severally liable for $1,506,708.10 is not grossly excessive.  See <u>United States v. Mackby</u>, 339 F.3d 1013 (9th Cir. 2003) (finding imposition of $550,000 in civil penalties under FCA not excessive where single damages totaled less than $59,000).

For these reasons; the Court will enter judgment in favor of the government and against Defendants in the amount of $1,506,708.10.  A separate order will issue.

/s/

William M. Nickerson
Senior United States District Judge

Dated: September 29, 2004