<u>**UNPUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 04-2276

UNITED STATES OF AMERICA,

                                             Plaintiff - Appellee,

      versus

JOHN J. RACHEL; PRISCILLA RACHEL; RGI, INCORPORATED, a Virginia Corporation; CSM, INCORPORATED, a Maryland Corporation,

                                             Defendants - Appellants.

Appeal from the United States District Court for the District of Maryland, at Baltimore.  William M. Nickerson, Senior District Judge.  (CA-02-754-WMN)

Argued:  November 29, 2005          Decided:  December 7, 2006

Before WIDENER and SHEDD, Circuit Judges, and Walter D. KELLEY, Jr., United States District Judge for the Eastern District of Virginia, sitting by designation.

Vacated and remanded by unpublished per curiam opinion.

**ARGUED**: Edward Jay Tolchin, FETTMANN, TOLCHIN & MAJORS, P.C., Fairfax, Virginia, for Appellants.  Tamera Lynn Fine, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.  **ON BRIEF**: Allen F. Loucks, United States Attorney, Baltimore, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

The United States of America brought this civil action against John Rachel, his wife Priscilla Rachel, and two corporations owned by him (RGI, Inc. and CSM, Inc.)[1] contending that they are liable under the False Claims Act ("FCA") and several common law theories. After discovery, the parties filed cross-motions for summary judgment. The United States' motion addressed only the appellants' liability. The district court denied the appellants' motion and granted the United States' motion on the FCA claims.[2] Thereafter, the United States sought a prejudgment writ of attachment on the Rachels' property pursuant to the Federal Debt Collection Procedures Act, and it also moved for summary judgment on the issue of damages flowing from the FCA violations. In separate orders, the district court granted the writ of attachment, denied the appellants' motion to quash the writ, and awarded the United States $1,506,708.10 in damages and penalties. The appellants now appeal the summary judgment rulings and the writ of attachment. As explained below, we conclude that the district court erred in entering summary judgment on the issue of the appellants'

---

[1] We will refer to the Rachels and the two corporate entities collectively as "the appellants" except where it is necessary to identify them individually.

[2] The district court dismissed the United States' common law causes of action as moot.

liability.  Accordingly, we vacate the summary judgment and the writ of attachment, and we remand for further proceedings.

I

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The relevant inquiry in a summary judgment analysis is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  "We review the district court's order granting summary judgment de novo, viewing the facts in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." Garofolo v. Donald B. Heslep Assocs., Inc., 405 F.3d 194, 198 (4th Cir. 2005).  Of course, we do not weigh the evidence or make credibility determinations in this analysis. Williams v. Staples, Inc., 372 F.3d 662, 667 (4th Cir. 2004).

The FCA, codified at 31 U.S.C. §§ 3729 et seq., "prohibits any person from making false or fraudulent claims for payment to the United States." Graham County Soil & Water Conserv. Dist. v. United States ex rel. Wilson, 545 U.S. 409, 411 (2005).  The United

States brought its FCA causes of action under subsections (1), (2), and (3) of 31 U.S.C. § 3729(a), which create liability for any person who:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval;
>
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [or]
>
> (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

The FCA specifies that a person acts "knowingly" with respect to information if he "has actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b).

The district court found that summary judgment was proper against the appellants on each of the United States' three FCA causes of action.  These causes of action arise from the billing associated with computer-repair work performed under a government contract.  In essence, the United States' theory is that Mr. Rachel fraudulently utilized his two companies, RGI and CSM, to inflate the costs associated with the repair work, thereby causing false claims to be submitted to, and paid by, the government.  The United States contends that Mrs. Rachel is liable because she acted in deliberate ignorance or reckless disregard of Mr. Rachel's fraudulent activities.

4

Generally, the record establishes that in 1994, RGI entered into a "Teaming Agreement" with Diez Management Systems, Inc. ("Diez") to cooperate in obtaining and satisfying an IRS contract for computer maintenance and repair. Mr. Rachel, the owner and president of RGI, signed the Teaming Agreement on behalf of RGI. The IRS contract had two components: (1) on-site maintenance for all computer equipment in IRS facilities in the Washington, D.C., region and (2) nationwide mail-in repair of IRS laptop or notebook computers. Pertinent to this case, the IRS contract addressed the repair of broken laptop hinges. As the IRS contract solicitation explained, the government had "experienced a chronic problem of broken hinges/cases with the Vinsotec notebook computers. Approximately 57% of all notebook repairs in a recent three month period ha[d] included the repair of broken hinges/cases." J.A. 121.

Diez was awarded the IRS contract in 1995. Under the terms of the IRS contract, Diez would service and repair computers for the IRS, billing for the actual cost of the time and materials utilized in the repairs plus a fixed markup. Regarding the laptop hinge repairs, the IRS contract required Diez "to propose a solution including a six-month warranty (parts and labor) on repairs to the Vinsotec notebook hinges/cases." J.A. 313.

Mr. Rachel and an RGI design team developed a means to repair the broken laptop hinges (the "Hinge Repair Kit"). Mr. Rachel

created initial prototypes of the Hinge Repair Kit, and he later obtained a patent for his Hinge Repair Kit.  One prototype was also prepared by Technical Design Resources ("TDR").

Under the IRS contract, when an IRS laptop needed hinge repair, it was mailed or shipped to a location which met IRS security requirements for safeguarding property and information. This location, known as the depot, was first located at RGI, but it was later moved to Diez.  At the depot, employees would prepare the laptops for repair, and Mr. Rachel would then deliver the laptop covers to TDR, which was responsible for manufacturing and installing the Hinge Repair Kits in accordance with the patent specifications.  Mr. Rachel would then return the repaired laptops to the depot where they would be reassembled.

Shortly after work started under the IRS contract, Mr. Rachel incorporated CSM, executing the CSM Articles of Incorporation on behalf of himself, Mrs. Rachel, and his son.  The CSM Articles of Incorporation listed Mrs. Rachel as an incorporator, director, and officer of CSM.  Mr. Rachel had Mrs. Rachel's general consent and authority to use and sign her name in this manner.  Mrs. Rachel was a nurse, and it appears to be undisputed that she did not have actual knowledge concerning the underlying events.

After its incorporation, CSM became involved in the hinge repair process.  Specifically, CSM supplanted RGI's role in obtaining the repaired laptops directly from TDR.  Under this

arrangement, CSM would pay TDR Between $23 and $27 for each Hinge Repair Kit manufactured and installed by TDR, and CSM would then invoice RGI $117 for the same.  RGI in turn would pay CSM and then bill Diez $122.84 (which is $117 plus a markup).  Diez would then pay RGI and bill the IRS $128.99 (which is $122.84 plus a markup).  The IRS would then pay Diez.

The crux of the United States' FCA case is CSM's involvement in the hinge-repair process, specifically the fact that CSM paid TDR approximately $25 for the Hinge Repair Kit and then billed RGI $117.  When asked at his deposition about CSM's involvement, Mr. Rachel explained that he was not certain that the Hinge Repair Kits would work, and if they failed they could seriously damage electronic components in the laptops.  Therefore, because of his concern about the potential negative financial consequences to RGI under the terms of the six-month warranty if the Hinge Repair Kits failed, Mr. Rachel attempted to use CSM as a "buffer"; if the Hinge Repair Kits failed he "would just defunct" CSM.  J.A. 497.

II

In granting summary judgment against the appellants on the issue of FCA liability, the district court articulated two primary rulings.  We hold that neither of these rulings is appropriate on the record before us.

The district court first addressed Mrs. Rachel's potential liability under the FCA and found that she "acted at least in reckless disregard of the truth or falsity of the information being submitted by CSM to RGI and eventually to the IRS." J.A. 34. The district court based its conclusion on the fact that Mrs. Rachel (1) served on the RGI board of directors, (2) was identified in documents as an incorporator, officer, and director of CSM, and (3) gave Mr. Rachel general authority to use her name and identity.[3] The district court then discussed the potential liability of all of the appellants. Framing the "relevant inquiry" as being "whether the CSM markup of the TDR invoice was fraudulent," the district court answered this query in the affirmative. J.A. 36.[4] The district court based its conclusion on the fact that Mr. Rachel owned and controlled both RGI and CSM, and its belief that CSM appears to have existed primarily, if not exclusively, for the

---

[3] Although the district court relied on Mrs. Rachel's service on the RGI board as a factor supporting her imputed knowledge of the alleged fraud, the United States admitted during discovery that she was actually not an owner, officer, director, or employee of RGI at the time of the alleged fraud.

[4] The district court prefaced this discussion by ruling that under the FCA "a direct contractual relationship with the Government is not required for liability." J.A. 35-36. This ruling was in response to the appellants' argument, which they repeat on appeal, that they could not have violated the FCA because neither the IRS contract nor any law precluded CSM from charging any amount it desired for the hinge repair. Because the FCA creates liability for "all fraudulent attempts to cause the Government to pay out sums of money," United States v. Neifert-White Co., 390 U.S. 228, 233 (1968), we reject the appellants' argument.

purpose of the markup.  Additionally, the district court noted that no evidence was presented regarding the actual costs of the warranty expenses, and it expressly found "it difficult to believe that a six-month warranty would cost four times the amount of the product itself."  J.A. 38.

Although we are not prepared to rule as a matter of law that the appellants cannot be held liable for the alleged FCA violations, we certainly do not believe (as the district court found) that the evidence establishes their liability as a matter of law.  Instead, viewing the evidence in this case in the light most favorable to Mrs. Rachel, who was not directly involved in any of the underlying conduct, a reasonable factfinder could conclude that she did not have either actual or implied knowledge for purposes of FCA liability.  For this reason, the district court erred in entering summary judgment against Mrs. Rachel.  Likewise, viewing the evidence in the light most favorable to all appellants, which tends to establish that the CSM markup was for the purpose of covering potential warranty costs, a reasonable factfinder could conclude that they did not submit or cause to be submitted false claims.  Accordingly, the district court also erred in entering summary judgment against the appellants.

III

Based on the foregoing, we vacate the summary judgment orders and remand for further proceedings consistent with this opinion. Because the district court appears to have relied on its FCA liability summary judgment ruling as a primary basis for granting (or refusing to quash) the prejudgment writ of attachment, we also vacate the writ.[5]

<u>VACATED AND REMANDED</u>

---

[5] In light of our determination that the district court erred in holding the appellants liable as a matter of law, we need not address the parties' arguments concerning damages. Additionally, although the parties have presented other arguments relating to the appellants' potential liability on the FCA and state-law claims, we decline to address those arguments on this record. <u>See, e.g.</u>, <u>Coyne & Delany Co. v. Selman</u>, 98 F.3d 1457, 1473 n.20 (4th Cir. 1996) (declining to consider alternative issues that may be considered by the district court on remand).