**FETTMANN, TOLCHIN & MAJORS, P.C.**
10509 Judicial Drive
Suite 300
Fairfax, Virginia 22030
(703) 385-9500
(703) 385-9893 (facsimile)
(240) 526-7657 (personal facsimile for Mr. Tolchin)
etolchin@ftm-pc.com

## FACSIMILE TRANSMISSION SHEET

TO: Michael DiPietro                    DATE: July 31, 2007
Assistant United States Attorney

FACSIMILE NO: 410-962-9947

FROM: Ed Tolchin

RE: USA v. Rachel, et al

MESSAGE: See attached letter dated today.

NUMBER OF PAGES BEING SENT (INCLUDING THIS PAGE): 23

HARD COPY WILL FOLLOW    [X]       WILL NOT FOLLOW []

PLEASE CALL OUR OFFICE TO
    CONFIRM RECEIPT                YES [ ]      NO [xx]

IF THIS TRANSMISSION IS INCOMPLETE, PLEASE TELEPHONE LINDA IMMEDIATELY
AT (703) 385-9500

INFORMATION CONTAINED IN THIS FAX IS ATTORNEY-CLIENT PRIVILEGED AND
CONFIDENTIAL, INTENDED ONLY FOR THE USE OF THE ADDRESSEE. IF YOU ARE
NOT THE ADDRESSEE, YOU ARE HEREBY NOTIFIED THAT ANY DISCLOSURE OF
THIS FAX IS PROHIBITED. IF YOU HAVE RECEIVED THIS FAX IN ERROR, PLEASE
CALL US COLLECT ASAP. THANK YOU.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERCA** | : |
| | : |
| **Plaintiff** | : |
| | : |
| **v.** | :     **Case No. WMN-02-754** |
| | : |
| **JOHN RACHEL, et al.** | : |
| | : |
| **Defendants.** | : |

## DEFENDANTS' RULE 26(a)(2) DISCLOSURE

Defendants John Rachel, et al., pursuant to Fed. R. Civ. P. 26(a)(2), make this disclosure

to Plaintiff:

Defendants expect to call Darrell J. Oyer as an expert witness in the trial of this matter.

Attached hereto is a copy of Mr. Oyer's report.

Respectfully submitted,

Edward J. Tolchin
Fettmann, Tolchin, & Majors, P.C.
10509 Judicial Drive, Suite 300
Fairfax, VA 22030
703-385-9500
703-385-9893 (facsimile)
etolchin@ftm-pc.com

## Certificate of Service

I hereby certify on this 31st day of July, 2007, the foregoing Defendants' Rule 26(a)(2) Disclosure was served via first class mail, postage prepaid, on: Michael DiPietro, Assistant United States Attorney, Office of the United States Attorney, 36 South Chalres Street, Fourth Floor, Baltimore, Maryland 21201 (Fax No: 410-962-9947).

Edward J. Tolchin

# Expert Report of Darrell J. Oyer
# In the Matter of the United States of America v.
# John Rachel, et al.
# (Civil Action WMN-02-754)

**A. BACKGROUND.** The subject action is against John Rachel, et al. regarding a subcontract to RGI, Incorporated (RGI) from Diez Management Services, Inc. (DMSI) under the latter's prime contract with the Small Business Administration for the Internal Revenue Service (IRS).

The purpose of this expert report is (1) describe the government acquisition process applicable in this contracting circumstance and attested to RGI's compliance with applicable government contracting rules and regulations and (2) analyze the reasonableness of the cost estimating process and price for the item at issue in this matter. My opinions are based on my government contracting experience, cost accounting methodologies and my experience as a Certified Public Accountant (CPA) and as a Certified Cost Estimator/Analyst (CCE/A).

Enclosure A contains my biographical sketch. Enclosure B identifies the documents and other sources I reviewed and personnel I interviewed in forming my accounting opinions. Enclosure C is a list of my litigation experience during the past four years. Enclosure D lists my publications during the past ten years. Enclosures E, F and G pertain to my analysis of the estimated price.

**B. Government Acquisition Process.**

**1. Applicability of Federal Acquisition Regulation (FAR) to Prime Contracts.** The Federal acquisition process is established in the Federal Acquisition Regulation (FAR) *"The Federal Acquisition Regulations System is established for the codification and publication of uniform policies and procedures for acquisition by all executive agencies."* [FAR 1.101] (Emphasis added) The FAR provides guidance to executive agencies, as opposed to non-government entities, on how conduct acquisitions under prime contracts, defined as *"...a contract or contractual action entered into by the United States..."* [FAR 3.502-1] The definition of a prime contract includes the United States (U.S.) government as one of the parties to the contract.

A Contracting Officer is *"...a person with the authority to enter into, administer, and/or terminate contracts..."* [FAR 2.101] In advising a Contracting Officer on the formulation of a prime contract, the FAR directs *"...The contracting officer shall include in this section [of the contract] the clauses required by law or by this part and any additional clauses expected to be included in any resulting contract..."* [FAR 15.204-3]

The FAR contains over five hundred contract clauses for the Contracting Officer to consider in the formation of a prime contract. These clauses are contained in FAR SubPart 52.2.

**2. Applicability of Federal Acquisition Regulation (FAR) to Subcontracts.**
The FAR defines a subcontract as *"...a contract or contractual action entered into by a prime contractor or subcontractor ..."* [FAR 3.502-1] (Emphasis added) The U.S. government is not a party to a subcontract. In fact, the FAR and government practice is to insist that *"...Government representatives —(1) Must recognize the lack of privity of contract between the Government and subcontractors..."* [FAR 42.505 (b)] (Emphasis added) My understanding of the term "privity" is that a contract cannot confer rights or impose obligations arising under it on any person or agent except the parties to the contract.

Despite the lack of privity between the government and a subcontractor to a prime contractor, the government does not permit free rein for prime contractors in dealing with subcontractors. The government places contractual requirements on the prime contractor that are intended to "manage" subcontractor activities. In turn, should a prime contractor fail to meet these prime contract responsibilities, the government's recourse is against the prime contractor only—despite any culpability that the subcontractor might have in that circumstance.

Three specific examples of this process are (1) a requirement for prime contractors to obtain government consent to award certain subcontracts, (2) a requirement for prime contractors to assure that subcontract prices are fair and reasonable and (3) a requirement for a price adjustment to a prime contract price in the event of defective pricing by a subcontractor. First, *"If the contractor does not have an approved purchasing system, consent to subcontract is required for cost-reimbursement, time-and-materials, labor-hour, or letter contracts...for —(1) Cost-reimbursement, time-and-materials, or labor-hour subcontracts..."* [FAR 44.201-1 (b)] (Emphasis added) The documents I reviewed do not indicate that the IRS officially consented to RGI as a subcontractor, although the documents indicate that IRS was aware that RGI was a subcontractor to DMSI.

Second, *"The contracting officer is responsible for the determination of price reasonableness for the prime contract, including subcontracting costs..."* [FAR 15.404-3(a)] (Emphasis added) *"The prime contractor...shall —(1) Conduct appropriate cost or price analyses to establish the reasonableness of proposed subcontract prices..."* [FAR 15.404-3 (b)] It was DMSI's responsibility to analyze the RGI price before subcontract award and it was the IRS's responsibility to assure that DMSI did so.

Third, a FAR contract clause entitled "Price Reduction for Defective Cost or Pricing Data" provides that *"(a) If any price, including profit or fee, negotiated in connection with this contract, or any cost reimbursable under this contract, was increased by any significant amount because —(1) The Contractor or a subcontractor furnished cost*

2

*or pricing data that were not complete, accurate, and current as certified in its Certificate of Current Cost or Pricing Data; (2) A subcontractor or prospective subcontractor furnished the Contractor cost or pricing data that were not complete, accurate, and current as certified in the Contractor's Certificate of Current Cost or Pricing Data...the price or cost shall be reduced accordingly..."* [FAR 52.215-10] (Emphasis added) Note that it is prime contract price that is adjusted and the prime contractor and subcontractor are left to sort out any subcontract price adjustments between them.

**3. Summary of Contract/Subcontract Interrelationships.** The terms and conditions of a prime contract do not automatically migrate to subcontracts issued under that prime contract. The prime contractor has the responsibility to specifically pass on any prime contract provisions that are to be specifically incorporated into a written subcontract. The government has no rights to enforce either prime contract or subcontract provisions against a subcontractor. The government may enforce prime contract provisions on the prime contractor; the prime contractor may enforce subcontract provisions on the subcontractor. The government requires a prime contractor to ultimately be responsible for subcontractor actions by prime contract terms that give the government rights against the prime contractor for certain subcontractor actions.[1]

**4. Contracting Actions at Issue in this Proceeding.** As described in the Memorandum dated July 10, 2003, from the United States District Court for the District of Maryland, Judge William M. Nickerson, and as shown in the documentation underlying the factual statements cited, *"On November 17, 1994, Defendant RGI entered into a 'Teaming Agreement' with Diez Management Systems, Inc. (DMSI) to cooperate in obtaining and satisfying an Internal Revenue Service (IRS) contract for computer maintenance and repair."* The teaming agreement contemplated the future negotiation of a separate subcontract between RGI and DMSI. As further described, *"The contract, known as MNOMAP, had two components...and nation-wide mail-in repair of laptop or notebook computers. On or about October 1, 1995, DMSI was awarded the IRS contact. Under the terms of that contract, DMSI would service and repair laptop computers for the IRS, billing the IRS for the actual cost of time and materials utilized in the repairs plus a fixed markup."*[2] I have reviewed that contract.

---

[1] This discussion of government rights is limited to administrative processes arising from contracts and does not address government rights in civil or criminal proceedings.

[2] The validity of this contract could be challenged on the basis that FAR 16.102, Policies, provides that *"(c) The cost-plus-a-percentage-of-cost system of contracting shall not be used (see 10 U.S.C. 2306(a) and 41 U.S.C. 254(b))."* The materials portion of this contract reimburses the prime contractor for actual material costs plus a percentage of that cost. Although the prime contract refers to this additive as "material handling costs," I saw no evidence in the record that this additive was treated as an auditable material handling cost, but rather it appears to have been treated as a fixed percentage regardless of actual material handling costs. For such an arrangement to be legal, the additive must be based on actual material handling costs, not on a fixed percentage.

3

The Memorandum continues *"John Rachel, along with a design team of RGI employees, developed a means to repair the broken laptop hinge (the `Hinge Repair Kit') Rachel created initial prototypes of the Hinge Repair Kit; one prototype was prepared by Technical Design Resources (TDR).* I have reviewed portions of John Rachel's deposition transcript where he describes these facts. Under the prime contract, which I have reviewed, and as further explained by Mr. Rachel, as the Memorandum explains *"...when an IRS laptop computer needed its hinge repaired, it was mailed or shipped to a location which met the security requirements for safeguarding IRS property and information. This location was referred to as the depot or the repair depot. At the depot, RGI and later DMSI employees would prepare each laptop computer for repair by removing the screen and any electronics from the laptop cover. John Rachel personally picked up the laptop covers from the depot and delivered them to TDR* [subcontractor to Computer Specialties of Maryland (CSM), who in turn was a subcontractor to RGI[3]], *which was responsible for manufacturing the Hinge Repair Kits in accordance with the specifications set forth in the patent. Rachel would then personally pick up the covers with the Hinge Repair Kits installed and return them to the depot, where employees would reassemble the laptops."* I have reviewed portions of Mr. Rachel's testimony where he explained these matters.

I reviewed the prime contract document. However, I found no written subcontract agreement, and it appears that no written subcontract document was negotiated. The documents reviewed indicate that RGI and DMSI considered the price that RGI would charge to be a fixed price per unit repaired and contemplated no price adjustment to the fixed price for any circumstance.

According to the December 22, 2004, brief filed by the RGI attorney and the documentation cited therein, including the excerpts from Mr. Watona, the government's Contracting Officer Technical Representative (COTR), which I have reviewed, *"DMSI told the Government that it had "farmed out" the hinge repairs to RGI. The Government, through its Contracting Officer's Technical Representative George Watona, thereafter asked RGI how much the repair would cost, and RGI stated that the repair would cost, and RGI stated that the repair would be $122.85, an amount which the government accepted."* Moreover, *"the Government understood that it would be paying for not only the hinge repair, but the warranty too."* There is no indication that the government inquired as to the details of the proposed price from RGI to DMSI before the transactions transpired. Based on my experience, this circumstance is indicative of the customer (IRS) being satisfied that the price was fair and reasonable and thus the customer did not require any cost estimate details. The same brief relates, and the supporting documentation shows, that

---

[3] According to the Memorandum "Initially, RGI obtained the Hinge Repair Kits directly from Technical Design Resources, Inc. (TDR). Subsequently, Mr. Rachel formed CSM. RGI and CSM were under common control as defined by FAR Part 19 provisions on common control and affiliates.

4

the previous IRS supplier had charged approximately $100 per repair, and the subsequent supplier charged only slightly less, approximately $94.

The record indicates that RGI invoiced DMSI $122.85 per repair, which according to a letter from RGI to DMSI dated April 12, 1996, included General and Administrative (G&A) at 5%. By all indications, DMSI had an unwritten agreement to compensate RGI $122.85 per repair without any provision for subsequent price adjustment based on proof of actual costs, or any other condition. Thus, when RGI invoiced DMSI in accordance with the subcontract terms, each invoice contained but two facts--the number of laptops repaired and the agreed to price per unit. If both these numbers were stated correctly, the invoice was accurate and contained no false information.

Under these circumstances, if the government subsequently concludes for whatever reason that this price is unreasonable, their recourse is against the prime contractor (DMSI) only. In turn, DMSI could seek to reduce its price paid to RGI. The government is fully protected from overcharges from its supplier, DMSI, via contractual arrangements in prime contract; DMSI is (un)protected by contractual arrangements or lack of contractual arrangements in the "verbal" subcontract. In any event, the government has no right (and needs no right to be protected) to seek a price reduction <u>directly</u> from the subcontractor.

This report is not unmindful of the relationship of RGI and CSM. However, that relationship had no bearing on the price agreed to between DMSI an RGI. The bottom line price to DMSI made absolutely no representations as to expected RGI costs or costs of any other entity, including CSM—an entity who did not even exist on the date of price agreement. The relationship of RGI and CSM is irrelevant to the pricing and invoicing by RGI to DMSI because a firm fixed price was established without regard to cost data and before CSM was formed.

**5. Opinion.** Based on my experience in government contracting, the documents reviewed and my knowledge of the Federal Acquisition Regulation; the government has no right to seek a price reduction from RGI and the RGI invoices to DMSI were accurate and compliant with applicable contracting rules and regulations.

**C. Pricing of Subcontract.** Notwithstanding the prior section of this report, which concludes that cost and price reasonableness and realism should not be an issue, this section analyzes the subcontract price for cost and price reasonableness and realism as well as the RGI cost estimating process.

**1. Price Comparisons.** A prior contract price for this work was about $100 and a subsequent contract price was at least $94 because the price from the supplier to DMSI was $94 and DMSI would have marked up and resold to the government for at least that amount. Despite these facts, the government damages calculation, prices in excess of approximately $30 were deemed fraudulent. The government determined price is about 60% below prices accepted from other vendors before and after the contract at issue ended.

Enclosure E compares four pricing situations. Column (a) is the prior contract price to IRS, Column (b) is the DMSI price to IRS based on TDR costs of $23.20[4], Column (c) is the DMSI price to IRS based on TDR costs of $26.70[4] and Column (d) is the subsequent contract price to IRS based on its supplier's costs of $29.50. No details are available for the price in Columns (a). However, the prices under the DMSI contract can be partially detailed by entity, i.e., DMSI, RGI/CSM and TDR. Additionally, the cost of the subsequent contract also can be partially detailed.

Lines 3 through 11 present the pricing data for RGI/CSM. According to the government, the costs that I have identified in the schedule on line 12 as "unknown costs" should be considered as profit. Thus, the government concludes that an exorbitant profit of more than 400% was realized.[5]

The subsequent contract price to the government is not known; however, the vendor charged $29.50 to the subcontractor (compared to $26.70 for the TDR price to RGI) and the subcontractor charged the prime contractor $94 (compared to $122.85 for the RGI price to DMSI). At this point there would be less risk because the hinge solution was proven to work. Thus, a slightly lower price from the subcontractor to the prime contractor could be expected.

The government position of using a supplier cost to determine a reasonable price assumes that the subcontract price should be treated as a cost reimbursement arrangement between RGI and DMSI—apparently because the prime contract pricing arrangement was for "material" under a Time and Material contract, which results in IRS reimbursing DMSI for its costs paid to RGI. Clearly, IRS awarded a Time and Material contract to DMSI and just as clearly DMSI awarded a fixed price subcontract to RGI. The government's position also assumes that there are no other costs, which is unlikely to be the case in any such situation.

In government contracting *"A firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract. This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss."* [FAR 16.202-1] (Emphasis added) Thus, there is no basis for either the IRS or DMSI to demand a price adjustment to the RGI subcontract price based on actual cost experience.

---

[4]  Paragraph 8 of the Declaration of Senior Special Agent William Henry Armstrong indicates that the range of amounts was from $23.20 to $26.70. These extremes were used for my analyses.

[5]  It should be noted that legitimately achieving a profit level perceived as excessive does not violate contract laws or constitute fraud. The last remaining "excess" profit law was repealed about twenty years ago. Thus, a profit percentage per se is not evidence of improper actions.

6

**2. Price Analyses.** Defendant's attorney has provided me with two 2-page documents with handwritten price calculations, which I understand were prepared by RGI personnel. I have analyzed these in Enclosure F and G. I understand that these documents were created contemporaneously with the pricing of the subcontract between RGI and DMSI. Copies of the handwritten notes are contained in Enclosures H and I.

Exhibit F is an analysis of the first of these two documents and details the price estimate process. The author of the document estimated the cost of a repair in Lines 1 to 4. The costs include the cost of the actual repair, plus G&A at 5% and Fee (profit) at 10%. This total was $40.43 On Line 4. Because this is a fixed price subcontract, RGI would bear the risk of failure, i.e., the repairs were warranted by RGI. Therefore, in Lines 5 to 23, the author estimated the probability and cost of a failure. Lines 5 to 13 and Lines 19 to 22 detail the estimated costs if a repair failed. Lines 14 to 18 and 23 factor in a probability of failure. The estimated cost of failure was $74.49, which is the sum of Line 17 and Line 23. The total repair cost estimate is Line 4 plus Line 17 plus Line 23 (the cost of repair failure factored for the probability of failure). The total of this estimate is about $115.[6]

Exhibit G is an analysis of the second of these two documents and also details the price estimate process. The author of the document estimated the cost of a repair in Lines 1 to 4. The costs include the cost of the actual repair, plus G&A at 9% and Fee (profit) at 12%. This total was $42.73. Again, because this is a fixed price subcontract, RGI would bear the risk of failure. Therefore, in Lines 5 to 23, the author estimated the probability and cost of a failure. Lines 5 to 13 and 19 to 22 detail the estimated costs if a repair failed. Lines 14 to 18 and 23 factor in a probability of failure. The estimated cost of failure was $74.11, which is the sum of Line 16 and Line 21. The total estimate for the cost is Line 4 (cost of actual repairs) plus Line 16 plus Line 21 (the cost of repair failure factored for the probability of failure. The total of this estimate is about $117.[7]

The initial per unit price from TDR was $195 per hinge repair kit, which was reduced to about $35. This latter price was further reduced to approximately $25. RGI was able to reduce this price primarily by guaranteeing purchase of 4,000 units over an eighteen-month period. RGI assumed the risk that the government would not order the minimum, a risk that is not reflected in the estimated pricing. [RGI letter to TDR dated February 1, 1996.]

It should also be noted that none of these prices includes any amounts for the development work attributed to Mr. Rachel and RGI. Inclusion of such costs would increase the estimated price.

---

[6] The calculation of the $115 did not follow the customary pricing sequence of costs, then G&A then fee. Had this approach been utilized the price would have been approximately $126.50.

[7] The calculation of the $117 did not follow the customary pricing sequence of costs, then G&A then fee. Had this approach been utilized the price would have been approximately $133.40.

7

Based on this analysis, a price of $120 to $130 to the government would be reasonable.

**3. Opinion.** In my opinion, based on my experience in government contracting, the documents reviewed and my knowledge estimating techniques, the fixed subcontract price of $128.99 was reasonable and clearly lawful and the RGI estimating process was reasonable.

**D. ADDITIONAL WORK.** In the event additional information relevant to my expert accounting opinions becomes available, I may need to supplement this report.

**E. COMPENSATION.** My hourly rate for performing these services is $250. I have incurred approximately 32 hours for this engagement.

*Darrell J. Oyer & Co.*

**DARRELL J. OYER & CO.**
July 30, 2007

# Enclosure A
# Biographical Sketch
# Bio for Darrell J. Oyer

### *Experience*

Prior to forming his own Firm in 1991, Mr. Oyer was a partner with Deloitte & Touche, an international accounting firm. He had approximately 9 years of experience with Deloitte & Touche, Touche Ross and Peat Marwick. Before that Mr. Oyer served nearly 20 years in the Defense Contract Audit Agency (DCAA) in various capacities. As a field staff auditor, he was involved in the large contractors' price proposals and review of direct and indirect incurred costs. As a DCAA Headquarters program manager he specialized in quantitative auditing techniques, statistical sampling, computer auditing techniques, judicial and quasi-judicial cost accounting decisions and Cost Accounting Standards. Mr. Oyer was also Assistant Regional Director in the Atlanta Region, DCAA with responsibility for ten audit offices. Mr. Oyer served as Assistant Director, DCAA in all three functional areas: Operations and Professional Development, Resources, and Policy and Plans. He has represented the U.S. Government in dealings with foreign Governments in the audit of multinational procurements.

### *Business Associations*

Mr. Oyer is a of Member of the Board of Directors of Schiebel Technology, Inc.; Warrenton, Virginia; a Member of the Advisory Board of the Government Contract Costs, Pricing, and Accounting Report and a Member of the Blue Cross/Blue Shield Financial Policy Board. Mr. Oyer was a Member of the Board of Directors of Firearms Training Systems, Atlanta, Georgia, until it was acquired by another company in October 2006; a Member of the Board of Directors of Deltek Systems, Inc., McLean, Virginia, until the company went private in 2002 and a former Member of the Board of Directors of Holston Defense Corporation (a wholly owned subsidiary of Eastman Chemical Company).

### *Education, Certifications and Professional Activities*

Mr. Oyer received the Bachelor of Science degree in accountancy from the University of Illinois and a Master of Business Administration degree from American University. He is a Certified Public Accountant (CPA) in Virginia and is a member and Fellow of the National Contract Management Association (NCMA), a member of the National Defense Industrial Association (NDIA), and a member of the Institute of Management Accountants (IMA). He is past Chairman of the NDIA Procurement Division, is past chairman of the NDIA Contract Finance Committee, is past chairman of the NDIA Smaller Companies Subcommittee, has twice served as president of the Northern Virginia IMA chapter and is a former member of the National Research Committee of IMA and the IMA Management Accounting Practices Committee, and formerly the chairman of the Cost Accounting Standards Subcommittee of IMA. Mr. Oyer has the Certified Management Accountant (CMA) from the IMA, the Certified Professional Contract Manager (CPCM) from the NCMA, the Certified Cost Estimator/Analyst (CCE/A) from the Society of Cost Estimating and Analysis, and the

9


EXHIBIT
A

Certified Data Processing Certificate (CDP) from the Data Processing Management Association. Mr. Oyer is a member of the Procurement Roundtable, a non-profit organization whose members are former government procurement and contract administration executives. Mr. Oyer received the NDIA Howard Cork Memorial Award in 2003.

### *Publications and Speaking*

Mr. Oyer is editor of the texts "Accounting for Government Contracts—Cost Accounting Standards" (2006) and "Accounting for Government Contracts--Federal Acquisition Regulation" (1985), is author of the book "Pricing and Cost Accounting--A Handbook for Government Contractors" (1999) and authored the chapter on Activity Based Costing in government Contracts for the "Handbook of Cost Management" (1990). He wrote the lead article in the initial publication of "Government Contract Costs, Pricing, and Accounting Report" (1989) on the subject of Uncompensated Overtime and has contributed numerous articles since then. He co-authored the Deloitte & Touche "A Guide to Truth-In-Negotiations (Defective Pricing, PL 87-653" (1986) and "Basic Cost Accounting Considerations in Government Contracting" (1989). Mr. Oyer was editor of the discontinued newsletter "Contract Pricing Advisor." He is also a frequent speaker and lecturer on contracting subjects and teaches graduate level accounting courses for the University of Houston--Clear Lake.

### *Areas of Expertise*

Mr. Oyer is highly experienced in the application and interpretation of the Federal Acquisition Regulation (FAR) and department FAR Supplements, Financial Accounting Standards Board (FASB) pronouncements and Cost Accounting Standards Board (CASB) promulgations. His work in these areas includes developing, implementing and reviewing cost accounting structures, accounting systems, estimating systems, cost control systems, purchasing systems and labor recording systems to ensure compliance with federal procurement accounting requirements. He has also designed compliance programs and prepared financial audit plans for internal audit organizations. He also performs audits of indirect cost rates for contractors with state and local government contracts. Mr. Oyer has testified in about twenty-five Board of Contract Appeals and court cases involving cost and government procurement issues.

### *Personal*

Mr. Oyer served in the U.S. Air Force as a contract auditor from 1963 to 1967. He completed his military service at the rank of Captain. He and his wife Connie live in McLean, Virginia. Mr. Oyer has served as president of the University of Illinois Alumni Club of Greater Washington, DC and has performed substantial genealogy research.

10

<div align="right">Enclosure B</div>

## Documents Reviewed and Personnel Interviewed

A.  Documents Reviewed.

1.  Teaming Agreement dated November 17, 1994. (Bates Stamp 00101 to 00106)
2.  Contract between IRS and Diez Management Systems, Inc.
3.  Letter to Technical Design Resources, Inc. from Computer Specialties of Maryland, Inc. dated February 1, 1996. (Bates Stamp 00569)
4.  Letter to Diez Management Systems, Inc. from RGI dated March 20, 1996. (Bates Stamp 01521)
5.  Memorandum To the File by Mr. John M. Rogers dated March 28, 1996.  (Bates Stamp 01378 to 01379)
6.  Letter to Diez Management Systems, Inc. from RGI dated April 12, 1996. (Bates Stamp 01522 and 01523)
7.  Letter to Diez Management Systems, Inc. from Ichiban, Inc. dated February 18, 1997.
8.  FAX to Stan Hutt (DMSI) from RGI dated August 25, 1997. (Bates Stamp 01524)
9.  Two letters to Diez Management Systems, Inc. from RGI dated August 25, 1996. (Bates Stamp 01526 and 01527)
10.  Letter to RGI from Diez Management Systems, Inc. dated September 10, 1997. (Bates Stamp 01528 and 01529)
11.  Letter to RGI from Diez Management Systems, Inc. dated October 28, 1997. (Bates Stamp 01530)
12.  Complaint and Demand for Jury Trial in U.S. District Court for Maryland dated March 11, 2002. (Bates Stamp 00069 to 00080)
13.  Deposition transcript of Mr. John Rachel dated December 12, 2002.  (Bates Stamp 00789 to 01036)
14.  Memorandum in U.S. District Court for Maryland dated July 10, 2003.
15.  Declaration of Mr. John Rachel dated March 16, 2004.  (Bates Stamp 00574 to 00580)
16.  Memorandum in U.S. District Court for Maryland dated September 29, 2004. (Bates Stamp 00009 to 00016)
17.  Brief of Appellants John Rachel, et al in U.S. Court of Appeals for the Fourth Circuit dated December 22, 2004.
18.  Declaration of Senior Special Agent William Harry Armstrong undated. (Bates Stamp 00719 to 00765)
19.  Two handwritten 2-page documents regarding pricing, undated.
20.  Plaintiff's Response to Defendants' First Request of Admissions undated. (Bates Stamp 00505 to 00512)
21.  Deposition of George Watona (Bates Stamp 207-228/1455-1501)
22.  Ichiban Pricing Documentation (Bates Stamp 498-504)

<div align="center">11</div>



23. Price Comparison (Bates Stamp 628)
24. Initial TDR Pricing (Bates Stamp (1120-1125)
25. Federal Acquisition Regulation.

B. Personnel Interviewed.

None.

12

Enclosure C

# Litigation Experience
## Past Four Years (July 1, 2003 to Present)

1. **Omni** v. Department of Agriculture (Board of Contract Appeals), Deposition and testimony on the price adjustment due to breach of contract, 2003.

2. **Holston Defense Corporation** v. Tennessee Department of Taxation (State Court), deposition and testimony on sales tax matter, 2003.

3. **SAIC** v. Environmental Protection Agency, (Bid Protest at GAO), Affidavit on pricing matters, 2004.

4. Lockheed Martin Corporation v. U.S. Army, (Bid Protest at GAO), **ATK Systems, Intervenor**), Affidavit on cost realism review, 2004.

5. EG&G v. Treasury **(Intervener VSE)**, (Bid Protest at GAO), Affidavit on cost realism, 2006.

6. **Dick Corporation** v. Maryland SHA, (Maryland State Board), Deposition and testimony on cost reasonableness, 2006.

7. **Marine Hydraulics** v. U.S. Navy, (Bid Protest at GAO), Affidavit on cost realism, 2006.

8. **Sikorsky Aircraft Co.** v. U.S. Air Force, (Bid Protest at GAO), Affidavit on cost realism, 2007.

9. **L-3 Communications** v. U.S. Army, (Bid Protest at GAO), Affidavit on cost realism, 2007.

This litigation experience is limited actual testimony, deposition or affidavit and excludes engagements where no testimony, deposition or affidavit was given or is yet to be given.

Key: Client in Bold Face Type.

13


EXHIBIT
C

Enclosure D

## Publications
## Past Ten Years (July 1, 1997 to Present)

1. Editor of the Nexis/Lexis reference text "Government Contract Costs - Federal Acquisition Regulation" as of July 2006, first published in 1985 and updated annually.

2. Editor of the Nexis/Lexis reference text "Government Contract Costs – Cost Accounting Standard" as of July 2006, first published in 1985 and updated annually

3. Chapter on Government Contracts for the "Handbook of Cost Management," published by Warren, Gorham and Lamont in December 1991 and periodically updated.

4. Feature article on "Allocation of Fringe Benefit Costs" for the "Government Contract Costs, Pricing and Accounting Report" issued by the Federal Publications, Inc., August 1997.

5. Editor-in-Chief of the "Contract Pricing Advisor" published monthly by Management Concepts, Inc., beginning June 1998 and subsequently discontinued.

6. "Pricing and Cost Accounting—A Handbook for Government Contractors," published by Management Concepts, Inc., December 1999 and updated in 2005.

7. Feature article "Benefit to the Government as an Erroneous Basis of Cost Allocation under Government Contracts," Federal Contract Reporter, joint with Mr. George M. Coburn, October 2000.

8. Article on "Developing Cost Estimates for Proposal to the Government," Journal of the Association of Proposal Management, Spring 2001.

9. Feature article on "Accounting for Material Handling, Purchasing and Similar Costs, " for the "Government Contract Costs, Pricing and Accounting Report" issued by the Federal Publications, Inc., May 2007.

14



EXHIBIT

## Analysis of Handwritten Worksheet #1

Enclosure F

| Line # | Item | Amount | Amount | Source |
|---|---|---|---|---|
| | Repair Estimate | | | |
| 1 | Estimate | $35.00 | | Author's estimate |
| 2 | G&A at 5% | 1.75 | | Author's estimate |
| 3 | Fee at 10% | 3.68 | | Author's estimate |
| 4 | Total Repair Estimate | $40.43 | $40.43 | Total |
| | Estimated Cost if Repairs Fail | | | |
| 5 | New Cover | $36.55 | | Author's estimate |
| 6 | New Repair Kit | 35.00 | | Author's estimate |
| 7 | LCD Cover | 36.56 | | Author's estimate |
| 8 | Till Support | 10.00 | | Author's estimate |
| 9 | Till Cover | 5.00 | | Author's estimate |
| 10 | Subtotal | $123.10 | | Subtotal rounded down by 1 cent |
| 11 | Shipping | 35.00 | | Author's estimate |
| 12 | Labor Cost and Fringes | 25.00 | | Author's estimate |
| 13 | Subtotal | $183.10 | | Subtotal |
| 14 | Failure Rate | 35% | | Author's estimate |
| 15 | Estimated Units per Month | 100 | | Author's estimate |
| 16 | Failure Amount | $6,408.50 | | Subtotal x Failure Rate x Est. Units per Mt. |
| 17 | Cost per Failed Unit | $64.09 | 64.09 | Failure Amount / Estimated Units per Month |
| 18 | Subtotal | | 104.51 | Subtotal |
| 19 | Memory Card | 480.00 | | Author's estimate |
| 20 | Cover | 5.00 | | Author's estimate |
| 21 | Front Cover | 35.50 | | Author's estimate |
| 22 | Subtotal | 520.50 | | Author's estimate |
| 23 | Failure rate 2% | 10.40 | 10.40 | Subtotal rounded down by 1 cent |
| 24 | Fixed Price for Repairs | | 115.00 | Total rounded up by 9 cents |

13



EXHIBIT

## Analysis of Handwritten Worksheet #2

Enclosure G

| Line # | Item | Amount | Amount | Source |
|---|---|---|---|---|
| | Repair Estimate | | | |
| 1 | Estimate | $35.00 | | Author's estimate |
| 2 | G&A at 9% | 3.15 | | Author's estimate |
| 3 | Fee at 12% | 4.58 | | Author's estimate |
| 4 | Total Repair Estimate | $42.73 | $42.73 | Total |
| | | | | |
| | Estimated Cost if Repairs Fail | | | |
| 5 | New Cover | $36.00 | | Author's estimate |
| 6 | New Repair Kit | 35.00 | | Author's estimate |
| 7 | LCD Cover | 36.00 | | Author's estimate |
| 8 | Tilt Support | 10.00 | | Author's estimate |
| 9 | Tilt Cover | 5.00 | | Author's estimate |
| 10 | Shipping | 35.00 | | Author's estimate |
| 11 | Labor Cost and Fringes | 25.00 | | Author's estimate |
| 12 | Total | $182.00 | | Subtotal |
| | | | | |
| 13 | Failure Rate | 35% | | Author's estimate |
| 14 | Estimate per Month | 100 | | Author's estimate |
| 15 | Failure Amount | $6,370.00 | | Subtotal x Failure Rate x Est. Units per Mt. |
| 16 | Cost per Failed Unit | $63.70 | 63.70 | Failure Amount / Estimated Units per Month |
| 17 | Memory Card | $480.00 | | Author's estimate |
| 18 | Cover | 5.00 | | Author's estimate |
| 19 | Front Cover | 35.50 | | Author's estimate |
| 20 | Subtotal | $520.50 | | Subtotal |
| 21 | Failure rate 2% | $10.41 | 10.41 | Subtotal |
| | | | | |
| 22 | Fixed Price for Repairs | | $117.00 | Total rounded up by 16 cents |

14

# Hinge Kit Pricing

Estimated Quantity: Unknown, Figure 100 per month

Cost Estimate: $30-40 in Reasonable Quantities $35
    Price GSA 5% / Fee 10%    $40.43

Cost if it Fails:

| | |
|---|---|
| Minimum Parts New Cover | 36.55 |
| New Repair Kit | 35.00 |
| LCD Cover | 36.55 |
| Tilt Support | 10.00 |
| Tilt Cover | ~~15.00~~ 5.00 |
| | $123.10 |

| | |
|---|---|
| ~~Might Also Break~~ Shipping both ways | 35.00 |
| Labor Cost / Fringes | 25.00 |
| | $183.10 |

Imatest Failure 30-40% use 35%

| | |
|---|---|
| @ .35 per month | $~~64.08~~ 64.50 |
| For 100 month | $64.69 Risk Each |
| Cost / Unit | $104.50 |

Other Parts That Might Break

| | |
|---|---|
| Memory Board | $480.00 |
| Cover | 5.00 |
| ~~Electronic Card~~ Front Cover | 35.50 |
| | $520.50 |

| | |
|---|---|
| Figure Total | $10.40 |
| Tote | $115 |

EXHIBIT
H

EXHIBIT

I

6

Failure Rate %

w/ Extended warranty
Failure 35% over 5 = Cost $6370
(35 x 182)

Risk would be 100 units per month $6370
(100 ÷ $6,370 = $63.70

Other Parts that might break

| | |
|---|---|
| Memory Board | $400 |
| Cover | 5.00 |
| Front Cover | 35.50 |
| | $ 540.50 |

Estimate % possibility
for Other Parts (2%) 5 years = $[illegible]

Summary for Cost

| | |
|---|---|
| Mfg | $11800 |
| Risk Repl[illegible] | [illegible] |
| | 13 [illegible] |
| Other Risk | 10 |
| | $ 117 |