**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| Plaintiff, | : | |
| **v.** | : | **Civil No. WMN-02-754** |
| **JOHN RACHEL, et. al**. | : | |
| Defendants | : | |

...oOo...

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE
TO RESTRICT REFERENCES TO THE TRUTH IN NEGOTIATIONS ACT**

The United States of America, by its undersigned counsel, Rod J. Rosenstein, United States Attorney for the district of Maryland and Jamie M. Bennett, Assistant United States Attorney for said district, respectfully submits this response to the defendant's Motion In Limine to restrict reference to the Truth In Negotiations Act during trial.

**STATEMENT OF FACTS**

The defendants have filed a Motion In Limine seeking to preclude the Government from referring during trial to the Truth In Negotiations Act or the FAR pricing provisions which were incorporated into the government contract at issue in this case. The defendants argue that the government should be precluded from "attempting to amend their complaint just weeks before trial by raising contentions of violations of the Truth In Negotiations Act . . . and the portion of the TINA required Federal Acquisition Regulation incorporated into the contract between the Government and a non-party, Diez

Management Systems, Inc. (DSMI)." Defendants' Memorandum In Support of Motion

in Limine, at. 1. ("Def. Mem. at ***") The defendants contend that the Government may

not rely upon this statute or on the FAR provisions relating to pricing as proof of the

defendant's submission of false and fraudulent claims in this case because "the

Government failed to sue under this statute, failed to provide discovery regarding this

new contention and has raised it for the first time in its own Motion in Limine concerning

the testimony of expert Darrell Oyer." *Id*. The defendants also argue that the

Government is precluded from relying upon TINA or the pricing provisions of the FAR

which are incorporated in the contract between the IRS and DSMI, because the

Government failed to explicitly reference those provisions in its responses to

interrogatories. Def. Mem. at 2.

The facts in this case as relevant to this motion as are follows: In November of

1994 the defendants entered into a Teaming Agreement with DSMI to bid on the IRS

laptop repair contract. That proposal identified DSMI as the prime contractor and RGI as

the subcontractor. In September of 1995, the defendant submitted a pricing proposal to

DSMI for this contract. This proposal was later conveyed to the IRS by Roberto Diez, the

President of the prime contractor, DSMI. In this pricing proposal, RGI represented that it

would charge the government only for direct material costs plus a five percent mark-up

for profit. The evidence shows that RGI paid its vendor, TDR, approximately $23 for the

hinge repair kits supplied under the contract and that RGI charged the IRS $122 for this

-2-

same item.  To accomplish this fraud the defendants created invoices falsely representing that RGI had purchased the hinge repair kit directly from CSM, a company created by Rachel for the sole purpose of inflating RGI's cost under the IRS contract.  The evidence further shows that the defendants never intended to comply with the pricing proposal submitted to the IRS.  On October 13, 1995, a mere twelve days after the contract was signed, the defendants submitted the first false invoice representing that RGI acquired the laptop repair kit from CMS for $122 not for $23.  In fact, the October 13, 1995 invoice pre-dated the legal existence of CMS by ten days.  That entity was not incorporated until October 23,1995.

The contract between DSMI and the IRS incorporated the standard FAR pricing provisions.  Those provisions make it clear that both the contractor and subcontractor were responsible for submitting accurate and current cost data. 48 C.F.R. § 52.215--22 (1991) (Price Reduction for Defective Cost or Pricing Data) and 52.215-24 (1994) (Subcontractor Cost or Pricing Data).[1]  The Truth In Negotiations Act also applies to both contractors and subcontractors.   10 U.S.C. §2306a(a) ("the head of an agency shall require offerors, contractors *and subcontractors* to make cost or pricing data available . . .")(emphasis added)**.**   At the time this contract was entered into, on October 1, 1995,

---

[1]     Subsection 52.215-24 provides that a contractor must submit "[t]he subcontractor's current, complete, and accurate cost or pricing data and Certificate of Current Cost or Pricing Data . . ..." 42 C.F.R. §52.215-22 (1994).  Subsection 52.215-22 provides for a price reduction for defective cost or pricing data. 42 C.F.R. §52.215-22(1991).

TINA applied to all contracts in excess of $500,000.  This contract exceeded that

threshold, as the total price was  $3,000,000.  The prime contractor, DMSI,  did not assert

an exemption from TINA.  There is, in fact, no basis for a waiver, since the contract was

neither issued pursuant to a sealed bid procedure, nor based upon adequate price

competition.  In fact, this was a Small Business Administration set-aside contract and the

government was not protected by competitive contracting process.  DSMI signed a

certificate of current cost, which proves that TINA applied to this contractor.

Cost or pricing data is defined both by statute and regulation.  Under the 1986

amendments to TINA, Congress defined cost or pricing data as "all information that is

verifiable and that, as of the date of agreement on the price of contract (or the price of a

contract modification), a prudent buyer or seller would reasonably expect to affect price

negotiations significantly.  Such terms do not include information that is judgmental, but

do include the factual information from which a judgement was derived."  10 U.S.C.

§2306(g)(1988).     The FAR also defines cost or pricing data to include:

> "all facts as of the date of price agreement that prudent buyers and sellers would
> reasonably expect to affect price negotiations significantly.  Cost or pricing data
> are factual, not judgmental, and are therefore verifiable.  While they do not
> indicate the accuracy of the prospective contractor's judgment about estimated
> future costs or projections, they do include that data forming the basis for that
> judgment.  Cost and pricing data are more than historical accounting data; they are
> all facts that can be reasonably expected to contribute to the soundness of
> estimates of future costs and to the validity of determinations of cost already
> incurred.  They also include such factors as (a) vendor quotations; (b) nonrecurring
> costs;( c ) information in changes in production or purchasing volume; (d) data
> supporting projections of business prospects and objectives and related operations

costs; (e) unit-cost trends such as those associated with labor efficiency; (f) make or buy decisions; (g) estimated resources to attain business goals; and (h) information on management decisions that could have a significant bearing on costs."

FAR §15.801

This definition was incorporated by reference in the contract between the IRS and DSMI and is binding on the prime and subcontractors.

The IRS did ask Rachel/RGI for cost and pricing data for the hinge repair kits. Rachel/ RGI told the IRS that their cost for the hinge repair kit was $117 and that the cost to the government would, therefore, be $122 with the addition of a five percent G&A mark-up. Although Rachel now claims that the additional costs were "reasonable" because they included the cost of providing the warranty, the cost of his patent and other indirect costs, he never told anyone at the IRS about those alleged additional costs at the time the contract was negotiated. And, In March, 1996, when the Contracting Officer John Roberts audited the contract, the defendants again misrepresented their cost of the hinge repair kit by showing him invoices only from CMS, and not from TDR. In fact, RGI was compensated for those alleged indirect costs through the indirect rates applied to direct labor costs charged by RGI.

## ARGUMENT

### I. INTRODUCTION

Under the False Claims Act, a defendant is liable for submitting false or fraudulent

claims to the government for payment. A claim can be false if it violates either a term of a contract with the government, federal law or regulations, or because the contract under which the claim was made was procured under false pretenses (for example, where the government can prove collusive bidding or promissory fraud). *See* John T. Boese, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS, §2/01[A] (3rd. Ed. 2006). In this case, the government alleges that the defendants claims were false and fraudulent both because they violated an agreement by the defendants to charge only for direct cost of materials *and* because those claims violated TINA and the FAR pricing provisions that were incorporated into the contract. There is no requirement that the government must actually bring a claim under the Truth in Negotiations Act to make these arguments, nor does the government seek to amend its complaint to include such a claim as the defendants assert.

The defendants claim that they are completely surprised by the government's argument that the claims they submitted to the IRS were false because they violated TINA and the FAR pricing proposals. This claim is particularly ironic in light of the fact that the defendants seek to offer the testimony of an expert witness, Darrell Oyer, who will opine that the very provisions the government relies upon as part of the basis of their FCA claim — TINA and the FAR pricing provisions – do not, in fact, apply to the defendants. Obviously, the defendants are abundantly aware of the statute and regulations upon which the government relies and their potential to create liability under

the False Claims Act.  If their counsel failed to pursue these issues in discovery, that was

due to his negligence, and not the fault of the government.

      The defendants attempt to cure the omission on the part of their counsel to pursue

discovery on this issue by contending that the government failed to disclose this theory in

response to their interrogatories. But as the Court has already ruled in this case, that the

government's response to the defendants' interrogatories, which refer the defendants "to

the documents produced pursuant to the Response to Request for Production for such

additional information as may be derived or ascertained from such records as easily by the

Defendants as by the United States," were appropriate because "[t]he interrogatories were

extremely broadly worded."  *United States v. Rachel*, 289 F.Supp.2d 688, 693, (D.Md.

2003).  If the defendants were dissatisfied with that response, they could easily have

propounded more narrowly drawn interrogatories.   In any event, that response was

sufficient to put them on notice of the government's claim that TINA and the FAR

imposed additional requirements on the defendants to disclose their actual costs, because

those pricing provisions can be found within the FAR and the four corners of the contract

between DSMI and the IRS.

## II. THE FALSE CLAIMS ACT AND TINA

      It is beyond dispute that a claim can be false under the False Claims Act either

because it violates the terms of a contract between the government and the defendants or

because it violates a statutory, regulatory or promissory duty a defendant owes to the

government.  The Fourth Circuit has already so ruled in this case and others.  As the

Court noted in its opinion reversing summary judgment for the government in this case:

> The district court prefaced this discussion by ruling that under the FCA " a
> direct contractual relationship with the government is not required for
> liability."  This ruling was in response to the appellants' argument, which
> they repeat on appeal, that they could not have violated the FCA because
> neither the IRS contract nor any law precluded CSM from charging any
> amount it desired for the hinge repair.  Because the FCA creates liability for
> "all fraudulent attempts to cause the Government to pay out sums of
> money," United States v. NeifertWhite Co, 390 U.S. 228, 233 (1968), we
> reject the appellants' argument.

*United States v. Rachel*, 2006 WL 3522228 at *3n.4 (4th Cir. 2006).

The Fourth Circuit has consistently recognized that false claims liability is not

restricted to claims that violate the terms of a contract.  *Harrison v. Westinghouse*

*Savannah River Co.*, 176 F.3d 776 (4th Cir. 1999) is a case in point.  There, the relator

alleged that the defendant, a government contract,  was liable under the False Claims Act

because it had "low-balled" the cost of hiring a subcontractor to gain approval for using a

subcontractor instead of performing a task called for under the contract itself.  176 F.3d at

791-92.  The Fourth Circuit accepted the proposition that false cost estimates provided to

the government could form the basis of a False Claims Act case under a theory of fraud in

the inducement.  *Id.*  (collecting cases).  It is notable that, although the falsity of the

defendants' claims in *Harrison* were based upon a defective pricing theory, there was, in

fact, no Truth in Negotiations Act claims included within that Complaint.

What the Fourth Circuit held in *Harrison* is instructive here:

-8-

The phrase "false or fraudulent claim in the False Claims Act is 'intended to reach all types of fraud, without qualification, that might result in financial loss to the Government . . . [T}he Court has consistently refused to accept a rigid, restrictive reading, *United States v. Neifert-White Co.*, 390 U.S. 228, 2332 , 88 S. Ct. 959, 19 L. Ed. 2d 1061(1968)(citation and footnotes omitted).   The False Claims Act reaches beyond claims which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money." *Id.* at 233, 88 S. Ct. 959.  Thus, any time a false statement is made in a transaction involving a call on the U.S. fisc, False Claims Act Liability may attach.

*Id.* at 788

The theories of promissory fraud[2] and fraud in the inducement upon which the

government relies here,  has been accepted since the very earliest days of the False Claims

Act.  In *United States ex. Rel. Marcus v. Hess*, the Supreme Court held that contracts

obtained through collusive bidding caused every subsequent claim submitted under them

to be improperly inflated.  317 U.S. 537 (1943).  In *Neifert-White Co.*, 390 U.S. 228

(1968), the Supreme Court ruled that "in selling bins to 12 grain farmers, one of the

respondent's officers prepared invoices in which the purchase price was deliberately

overstated . . . . to induce the CCC to extend loans to respondent's customers in amounts

exceeding 80% of the actual purchase price."  The CCC relied upon overstated price in

determining the amount of loans that were made.  The Supreme Court framed the issue

before them as follows: "Does the False Claims Act reach "claims" for favorable action

---

[2]        The promissory fraud is, of course, RGI's representation that he would charge the IRS only the direct cost of materials and a 5% markup.  That promise is contained in the pricing proposal that Rachel submitted to DSMI and that DSMI conveyed to the IRS>

by the Government upon applications for loans or is it confined to claims for payments

due and owing from the Government?"  The respondent argued that claims in the False

Claims Act "must be read in its narrow sense to include only a demand based upon the

Government's liability to the Claimant."  *Id*.  The Court's answer to this argument was a

resounding "No."   The Court held that "the [False Claims] Act was intended to reach all

types of fraud, without qualification, that might result in financial loss to the

Government," and that "the Act is broadly phrased to reach any person who makes or

causes to be made "any claim upon or against the United States, or who make a false "bill

receipt . . . claim . . . affidavit or deposition for the purpose of obtaining or aiding to

obtain the payment or approval of such a false claim."  *Id*. At 232.

    *United States v. Foster Wheeler*, 316 F. Supp. 963 (D.C.N.Y. 1970), a case upon

which the defendants inexplicably rely, actually supports the government's position.  In

*Foster Wheeler*, the government contended that during negotiations for a contract to

supply boilers to the Navy, the defendant had submitted cost and pricing data that were

inflated.  There were no TINA claims asserted in that case, but the Court had no trouble

finding that the defendant was liable under the False Claims Act for creating "false cost

figures and other false information in order to substantiate and justify the price . .  By

taking the detailed estimate prepared by the Estimating Section . . . and marking it up by

40%."  *Id*. at 968.  The Court went on to note that "this method of determining the price

employed by the defendant improperly assured excessive profits to Foster Wheeler and

was never disclosed to the Navy." *Id*.

In fact, the very passage quoted by the defendants from the Second Circuit opinon affirming the district court judgment proves the government's point that the United States may assert liability under the FCA *based upon* violations of TINA and the FAR pricing provisions. In *Foster Wheeler*, the final payment under the contract was made two years before TINA was enacted. The defendants argued that TINA had "withdrawn from the False Claims Act claims based upon the use of inflated cost estimates." The Court disagreed, noting that "[i]nflated cost estimates are different from fraudulent estimates. " The Court further noted that TINA "does not supersede the False Claims Act. There is no inconsistency between an Act which deals with fraud and one which deals with data which are "inaccurate, incomplete, or non-current." *United States v. Foster Wheeler,* 447 F.2d 100 (1971) (citations omitted). The government's reliance on TINA and the FAR pricing provisions to prove a violation of the FCA is completely proper. It is with reference to those provisions that it will be clear to the jury exactly *why* the claims that RGI submitted to the government were false and fraudulent. The claims were false and fraudulent because, among other reasons, the defendants had an obligation to disclose and charge the government for its true costs of the hinge repair kit, but declined to do so.

The defendant argues that TINA restricts the government to recovery of single damages for overcharges based upon defective pricing and that these damages are recoverable only from the prime contractor and never from a subcontractor. This simply

is not correct as a matter of case law or public policy.    If the defendants were correct, it would mean that a completely innocent prime contractor could be punished by being forced to relinquish the overcharge, while the guilty party, the subcontractor whose invoices were falsely inflated, would get away scott free.  To take the defendants' argument to their logical conclusion, the government would be limited to the remedy of recouping overcharges under TINA even if the prime contractor was a party to the fraud, *because the government could not sue either party under the False Claims Act based upon a TINA violation*.    What the defendant argues is that RINA preempts the False Claims Act in the area of defective pricing.  Not only is that not a sensible outcome, it is an outcome that is not countenanced by any Courts, including the Fourth Circuit.

The cases in which the government has based False Claims Act allegations on TINA violations –without suing under TINA – are legion.  For example, in *United States ex. rel. Taxpayers Against Fraud v. Link Flight Simulation Corp*., 722 F. Supp. 1248 (D.MD. 1989), a case from this district, the government sued under the False Claims Act based upon allegations of defective pricing in connection with negotiations for a contract to produce military flight simulators for the government to use in training pilots.  *Id*. at 1248.  *United States v. JT Construction Co., Inc.*, 668 F.Supp 592 (W.D. Tx. 1987)  is in accord.    In that case, the government brought a False Claims Act case premised on defective pricing against the defendant company, whose president had already been acquitted of criminal charges based upon the same allegations. There were no TINA

-12-

violations alleged in the civil complaint, but the government's case was based upon an underlying violation of TINA.

*United States v. DiBona*, 614 F. Supp. 40 (E.D Pa. 1984) is the same effect.  In that case, the prime contractor certified that the cost or pricing data submitted, which included data on historical hours worked,  were accurate, complete and current.  In fact, the contractor had inflated the actual number of hours worked.  The company and two of its principals were indicted and charged with criminal false claims act violations.  They pleaded guilty and the government filed a civil false claims act case against the defendants, followed by a motion for summary judgment.  The court held that the defendants were liable, under principles of collateral estoppel, for violating the false claims act.  If the defendant is correct that TINA is the sole remedy for defective pricing, none of these cases would have resulted in False Claims Act liability.   *See e.g., United States v. Science Applications Int'l Corp.*, WL 729684 (W.D. Tex. 2005)*; United States v. Rockwell International Corp.*, 795 F. Supp. 1131, 1132-33 (N.D. Ga. 1992); ; *United States ex.rel Campbell v. Lockheed Martin*, 282 F. Supp. 2d 1324 (M.D. Fla. 2003).

In conclusion, contrary to the defendant's arguments, the government is not charging the defendants with violating TINA.  Rather,  TINA and the defective pricing regulations set forth in FAR, along with other evidence, such as the defendants' pricing proposal and their course of conduct under the contract,  create the context within which the jury must evaluate whether the defendants' claims were, indeed,  false and fraudulent

-13-

as the government contends.

### III.  THE GOVERNMENT IS NOT BOUND BY THE INTERROGATORY
### ANSWER  UPON WHICH THE DEFENDANTS RELY
### <u>TO ESTOP REFERENCE TO TINA</u>

The defendants argue that the government is precluded from arguing anything about TINA or FAR pricing provisions because it failed to identify those theories in response to the defendants' interrogatories.  The defendants rely specifically upon Interrogatory No. 3, which asked the government to "Identify each specific provision in every contract that you contend limits any defendant's right to markup the product."  Def. Mem. at 2.  The government responded by "referring the defendants to the documents produced pursuant to the Response to Request for Production for such additional information as may be derived or ascertained from such records as easily by the Defendants as by the United States."  *Id*.  The government's answer refers the defendants broadly to all of the material produced by the government in its Response to the Request for Production of Documents.  That response encompasses the contract and the contract file, both of which refer to the FAR pricing provisions.  The response also encompasses the defendants' pricing proposal, Diez's pricing proposal, the Teaming Agreement, the prime contractors certificate of current cost, and the information and documents provided to the IRS by the defendants during the course of negotiations and performance of the contract, among the many other things that support the government's theory of why the

-14-

claims made in this case are false.

This Court has already held that the government's answer was acceptable, in light of the broad nature of this interrogatory. The defendants moved pursuant to Federal Rules of Civil Procedure 26 and 37 for an order of sanctions, arguing that the "Government's proffered . . . interrogatory responses, and document responses were so lacking as to constitute no proffer or response at all." *United States v. Rachel,* 289 F.Supp.2d 688, 692 (D. Md. 2003). The defendants specifically argued "that the Government's response referring Defendants "to the documents produced pursuant ot the Response to Request for Production for such additional witnesses or information as may be derived or ascertained from such records as easily by the United States," was unacceptable and equivalent to no response at all." *Id*. at 693. The Court held that the "government's interrogatory responses were appropriate . . . as the interrogatories were extremely broadly worded." *Id*. The Court noted that this was an acceptable response under Federal Rules of Civil Procedure 33(d), which "allows a party the option to produce the records when the requesting party is as capable of reviewing the documents and formulating a response to the interrogatory as is the answering party." *Id*. Under these circumstances, this response to the defendants' interrogatory can hardly be used to limit the government in any way at trial.

Furthermore, the defendants appear to be fully prepared to respond to the government's contentions about TINA and FAR, as the report of their proposed expert,

Darrell Oyer, makes clear.  That report, which is attached to the government's Motion To

Strike Expert Testimony, goes into great detail about TINA and the FAR pricing

provisions.   In fact, Mr. Oyer concedes that these provisions do apply to the contract

between the IRS and DSMI, see Oyer Report at p. 2, but argues that the government's

only recourse is against the prime contractor, DSMI.  *Id*. at 5.  The defendants have

advanced no persuasive argument either on the basis of the government's discovery

response or on the basis of surprise and lack of preparation, why the government should

be precluded from referring to TINA and the FAR pricing proposals during the trial.

## CONCLUSION

For all the foregoing reasons, the government respectfully requests that the Court

deny the defendants' Motion In Limine.


Respectfully submitted,

Rod J. Rosenstein
United States Attorney


By:  _/s/_____
     Jamie M. Bennett
     Assistant United States Attorney
     Bar No. 08468
     36 South Charles Street
     Baltimore, Maryland 21201-2692
      410/209-4838