IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

FILED
IN OPEN COURT

JUL 19

U.S. DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 99-150A |
| | ) | |
| | ) | |
| JOHN J. RACHEL, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

Statement of Facts

Had this matter proceeded to trial, the defendant agrees that the United States would have

proven the following beyond a reasonable doubt:

1.     On April 16, 1992, the Federal Aviation Administration (FAA) awarded prime

contract number DTFA01-92-C-00015, part of the Flight Data Input Output

(FDIO) Phase II project.  The FDIO contract was a fixed price prime contract that

had been set aside for a small business.  Pursuant to the contract, the FAA agreed

to pay Diez Management Information Systems (DMSI), a Section 8(a)

disadvantaged small business, $2,495,816.50 to provide the FAA with 2,625 dot-

matrix Dataproducts brand printers.

2.     In June 1992, after DMSI had begun to perform on the contract, the FAA

determined that the initial shipments of printers that DMSI had supplied to the

FAA did not meet the FAA's needs.  Specifically, FAA printer users were unable

to tear the FAA's unique flight strip printer paper along the paper's perforated

1

lines.  The FAA requested defendant Bowen, the FDIO Project Manager for DMSI, to research possible solutions to the printer problem.

3. Thereafter, defendant Bowen contacted defendant John J. Rachel, the owner of Computer Software Engineering, Inc. (CSEI) and RGI.  Defendant Bowen requested defendant Rachel's assistance in engineering and manufacturing a solution to the tear bar problem.  Defendant Bowen also agreed with defendant Rachel to direct to one of defendant Rachel's companies the performance of any future contract that DMSI could obtain from the FAA to correct the printer problem.  In return, defendant Rachel agreed to determine his price to provide the requested goods and services and to pay to defendant Bowen and, through Bowen, Richard S. Quigg, the Chief Financial Officer of DMSI, any amount above defendant Rachel's price that they could obtain through future contract negotiations with the FAA.

4. Subsequently, defendant Rachel enlisted the services of a small manufacturer located in Chantilly, Virginia.  The small company manufactured a tear bar prototype which the FAA tested and approved.

5. In early October of 1992, a representative of the FAA informed defendant Bowen that the FAA was going to modify the existing FDIO prime contract to pay DMSI additional funds to provide 2,625 modified tear bars.  The FAA representative also requested a tentative price quote from DMSI which defendant Bowen provided.  During subsequent contract negotiations with the FAA, defendant Bowen supplied to the FAA, on behalf of DMSI, price quotes from CSEI that he had obtained from

defendant Rachel. These CSEI price quotes were inflated to include the kickback

payments that defendant Rachel had agreed to pay to defendant Bowen and to

Quigg.

6.   On April 22, 1993, the FAA and DMSI entered into a fixed price modification to

the original FDIO prime contract (hereinafter referred to as the "Tear Bar

Contract"). Pursuant to the Tear Bar Contract, the FAA agreed to pay DMSI

$310,957.50 to provide the FAA with 2,625 modified tear bars and to obtain for

modification an additional 1,050 unmodified tear bars which DMSI needed to

produce the 2,625 modified tear bars. DMSI obtained the modified and

unmodified tear bars from CSEI which in turn (through RGI) paid the small

manufacturer in Chantilly, Virginia, a total of $77,762 for the modified tear bars.

CSEI obtained some of the unmodified tear bars from defendant Bowen and some

from DMSI.

7.   Pursuant to the Tear Bar Contract, from May 19, 1993, through September 23,

1993, the FAA paid DMSI $310,957.50; from April 27, 1993, through October

27, 1993, DMSI paid CSEI approximately $297,832; from March 3, 1993,

through August 16, 1993, CSEI paid RGI approximately $144,666; from August

4, 1992, through August 10, 1993, RGI and CSEI paid TDR approximately

$77,762 to manufacture the 2,625 tear bars.

8.   From May 20, 1993, through October 27, 1993, defendant Rachel paid defendant

Bowen $192,800 by drawing CSEI checks payable to Av Comm, Inc., a company

owned by defendant Bowen, and to KB Codes, Inc., a company owned by

3

defendant Bowen's wife. Approximately $56,000 of these funds represented

repayments of advances that defendant Bowen had made to defendant Rachel to

finance the tear bar modifications. Approximately $16,000 of these funds

represented costs that defendant Bowen had incurred to purchase 1,050

unmodified tear bars.

9.     In December 1993, defendant Bowen delivered $40,000 of the kickback funds that

he had received from defendant Rachel to Quigg. Specifically, defendant Bowen

caused a $40,000 check to be drawn on an account of AES, another corporation

of defendant Bowen's, payable to Quigg. Subsequently, Quigg falsely invoiced

AES for nonexistent consulting services to conceal the nature of the $40,000

payment he had received from AES.

10.    At all times material hereto, the defendant acted unlawfully, knowingly and

willfully with the intent to pay an unlawful kickback, in violation of Title 41 United

States Code Section 53. None of the defendant's conduct was the result of

accident, inadvertence, mistake or other innocent reason.

208

Respectfully submitted,

Helen F. Fahey
UNITED STATES ATTORNEY

By:   _____
Dabney Langhorne
Assistant United States Attorney

By:   _____
John J. Klein
Assistant United States Attorney

Seen and agreed by:

_____
John I. Rachel
Defendant

_____
Alan H. Yamamoto
Counsel for defendant

5