IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : Civil No. WMN-02-754 |
| | : |
| JOHN RACHEL et al. | : |
| | : |

**MEMORANDUM**

Pending before the Court are three motions: the government's "Motion to Bar Reference to Treble Damages and Penalties Before the Jury," Paper No. 68; the government's "Motion to Strike and/or Limit Expert Testimony by Darrell J. Oyer," Paper No. 66, and Defendants' motion in limine to preclude the government from arguing at trial that Defendants violated the Truth in Negotiations Act (TINA) and the "TINA-related Federal Acquisition Regulation incorporated into the contract between the government and a non-party." Paper No. 70. The first motion, barring reference to treble damages and civil penalties, is unopposed and will be granted for the reasons stated therein.[1] The remaining two motions are fully briefed and are ripe for review.[2] The Court will deny both the government's motion to strike and defendants' motion in limine, but will grant the government's request to depose Defendants' expert and designate an expert

---

[1] Under the False Claims Act, the government is entitled to a $5,000 to $10,000 civil penalty for each violation of the act plus three times the government's actual damages. 31 U.S.C. § 3729(a)(7).

[2] A fourth motion, the government's motion to admit 404(b) evidence, Paper No. 74, is not yet ripe.

1

witness in rebuttal.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

The government brought this civil action against Defendants John Rachel, his wife, Priscilla Rachel, and two corporations owned by Mr. Rachel, RGI and CSM, alleging violations of the False Claims Act (FCA), 31 U.S.C. § 3729 et seq. The relevant provisions of the FCA and the factual background for this action have been discussed in previous opinions of this Court and will not be repeated here.  Briefly stated, however, the government alleges that Defendants fraudulently overstated the costs associated with the repair of hinges on government-owned laptop computers.  According to the government, this fraud was accomplished by means of a shell corporation - CSM - set up by Mr. Rachel and his wife for the sole purpose of hiding exorbitant price mark-ups on hinge repair kits installed by another company, TDR.[3]  This Court granted summary judgment for the government and

---

[3]The repair and payment procedure for the government laptops at issue was as follows.  The IRS mailed broken laptops to the prime contractor, DMSI.  DMSI personnel disassembled the laptops. Mr. Rachel personally picked up the disassembled laptops from DMSI and delivered them to the company installing the hinge repair kits, TDR.  After TDR made the repairs, Mr. Rachel picked up the laptops and returned them to DMSI.  DMSI personnel reassembled the laptops and mailed them back to the IRS.
  TDR invoiced CSM, owned by Mr. Rachel, an amount between $23.20 and $26.70 for each hinge repair kit manufactured and installed.  CSM paid these invoices.  CSM then invoiced RGI, also owned by Mr. Rachel, $117 for each hinge repair kit manufactured and installed by TDR.  RGI prepared and submitted invoices to DMSI, billing DMSI $122.84 for each hinge repair kit.  DMSI included the payments to RGI in its invoices to the IRS for payment of services rendered under the contract, billing the IRS $128.99 for each hinge repair kit.  The IRS paid those invoices.

awarded damages and penalties accordingly.

On December 7, 2006, the Fourth Circuit vacated the summary judgment and remanded this case for further proceedings. <u>United States v. Rachel</u>, 208 F. App'x 236 (4th Cir. 2006). The Fourth Circuit ruled that summary judgment was improper because, viewing the evidence in the light most favorable to the Defendants, a reasonable factfinder could conclude that Mrs. Rachel "did not have either actual or implied knowledge" of any fraudulent conduct for purposes of FCA liability and, as to Mr. Rachel and the corporate Defendants, could conclude that the claims submitted or caused to be submitted to the government were not false if the CSM mark-up was "for the purpose of covering potential warranty costs." <u>Id</u>. at 240.

## II. TIMING OF THE EXPERT DESIGNATION

The government first contends that Defendants should be barred from presenting any expert testimony because the designation of Mr. Oyer was provided too late. The Court concludes that the expert designation was timely under Rule 26(a)(2)(C) in that Defendants designated Mr. Oyer as a witness on July 31, 2007, 90 days before the then existing October 29, 2007 trial date. <u>See</u> Fed. R. Civ. P. 26(a)(2)(C).[4] It was reasonable for Defendants to assume that the Rule 26(a)(2)(C)

---

[4] Rule 26(a)(2)(C) provides that, "in the absence of other directions from the court" expert designations must be made "at least 90 days before the trial date." At the time of designation, the trial was scheduled for October 29, 2007.

3

deadline applied given that the Court's amended scheduling order, entered on March 6, 2007, did not provide any deadline for designation of expert witnesses.  See Paper No. 60.  The Court's original scheduling order, Paper No. 8, entered July 23, 2002, did provide such a deadline (October 21, 2002), but subsequent to the entry of that scheduling order, Defendants successfully appealed the grant of summary judgment.  On remand, the amended scheduling order superceded any prior deadlines.  Accordingly, the government's motion to strike the expert testimony in its entirety is denied.

**III. GOVERNMENT'S MOTION TO LIMIT EXPERT TESTIMONY AND DEFENDANTS' MOTION IN LIMINE**

The government's substantive objections to Mr. Oyer's proposed testimony and the Defendants' motion in limine to exclude any contention that Defendants violated the Truth in Negotiations Act (TINA), 41 U.S.C. § 254b, are interrelated and the Court will address them together.

**A. TINA and Related Federal Acquisition Regulations**

TINA and the related Federal Acquisition Regulations (FAR) govern procurement procedures for public contracts with executive agencies.[5]  The purpose of TINA "is to provide a system of procurement that maximizes the Government's ability to fairly protect tax dollars.  To that end, TINA imposes a duty on

---

[5]There also is an identical Truth in Negotiations Act associated with procurement of military contracts codified at 10 U.S.C. § 2306a.  Most of the cases interpreting TINA arise under this parallel provision.

Government contractors to completely disclose cost and pricing information to the Government."  United States v. Lockheed Martin Corp., 282 F. Supp. 2d 1324, 1334 (M.D. Fla. 2003) (internal quotation omitted) (construing the military procurement TINA).

As pertinent to this case, TINA states that a contractor under a prime contract with the government "shall be required to submit cost or pricing data before the award of the contract" and "before the pricing of a change or modification to the contract[.]"  41 U.S.C. § 254b(a)(1).[6]  A subcontractor also "shall be required to submit cost or pricing data" both before the award of the subcontract and before a modification of the subcontract if the prime contractor was so required.  Id.  The implementing FAR, entitled "Subcontractor Cost or Pricing Data," states that the prime contractor "shall require the subcontractor to submit cost or pricing data" unless certain exceptions not relevant here apply.  48 C.F.R. § 52.215-24.

The term "cost or pricing data" is defined under the statute to mean:

> all facts that, as of the date of agreement on the price of a contract (or the price of a contract modification) . . . a prudent buyer or seller would reasonably expect to affect price negotiations significantly.  Such term does not include information that is judgmental, but does include factual information from which a judgment was derived.

41 U.S.C. § 254b(h)(1).

---

[6]The statute only applies if the contract price exceeds certain thresholds that vary by the year in which the parties entered into the contract.  In the instant case, the parties agree that TINA was applicable to the prime contract.

Both the prime contractor and the subcontractor "shall be required to certify, that, to the best of the person's knowledge and belief, the cost or pricing data submitted are accurate, complete, and current."  41 U.S.C. § 254b(a)(2); 48 C.F.R. § 52.215-24.  The prime contractor submits its certifications directly to the contracting officer for the government, while a subcontractor submits its certification to the prime.  42 U.S.C. § 254b(a)(3).

If a contractor or a subcontractor is determined to have submitted "defective cost or pricing data," the price of the prime contract "shall be adjusted" to exclude the amount by which the government was overcharged.  42 U.S.C. § 254b(e)(1); <u>See also</u> 48 C.F.R. § 52.215-22 (FAR entitled "Price Reduction for Defective Cost or Pricing Data").  Cost or pricing data is "defective" if, as of the date of agreement on the price of the contract or contract modification, it was "inaccurate, incomplete, or noncurrent."  42 U.S.C. § 254b(e)(2); <u>See also</u> 48 C.F.R. § 52.215-22.

In the instant case, the two FAR provisions implementing TINA were incorporated by reference into the contract between the government and the prime contractor, non-party DMSI.  There was no written subcontract between DMSI and Defendants RGI/CSM, however, and RGI/CSM made no TINA certification to DMSI.

### **B. Proposed Expert Testimony**

Defendants seek to put on expert testimony from Darrell J. Oyer, a CPA and Certified Cost Estimator/Analyst (CCE/A) with

6

extensive government contracting experience.  Mr. Oyer would testify 1) generally concerning the "government acquisition process applicable" to government contracts and would opine that "RGI[ complied] with applicable government contracting rules and regulations," and 2) would "analyze the reasonableness of the cost estimating process and price" for the hinge repair kits at issue.  Expert Report at 1.  Mr. Oyer would opine that the TINA-related FAR provisions place obligations on parties contracting directly with the government, i.e., prime contractors.  The burden of ensuring subcontractor compliance with FAR (and by extension, TINA) rests on the prime contractor, according to Mr. Oyer, and the government's only recourse for violation of the FAR by a prime contractor or a subcontractor is against the prime contractor.

Mr. Oyer also would opine that, in the instant case, while the prime contractor, DMSI, entered into a "Teaming Agreement" with Defendant RGI prior to negotiating the contract with the government, subsequent to the award of the contract to DMSI, no written subcontract agreement between DMSI and RGI was negotiated.  Thus, the FAR provisions incorporated by reference in the prime contract were never incorporated into DMSI's subcontract agreement with RGI.  Moreover, Mr. Oyer would testify that it appears that DMSI and RGI considered "the price that RGI would charge to be a fixed price per unit repaired," as opposed to a time and materials subcontract.  Id. at 5.  Mr. Oyer concludes that CSM's involvement is irrelevant as the fixed-price

per unit already had been negotiated "without regard to cost data" prior to Mr. Rachel forming CSM.  Id.  Based on this analysis, Mr. Oyer would opine that "the government has no right to seek a price reduction from RGI and the RGI invoices to DMSI were accurate and compliant with applicable contracting rules and regulations." Id.

### C. Discussion

The government first challenges Mr. Oyer's proposed testimony on the basis that he would express an opinion as to whether Defendants were required to comply with TINA and its implementing regulations as a matter of law, arguing that this testimony goes to the ultimate issue in the case.  Mot. to Strike at 5.  In response to this assertion, Defendants filed a motion in limine arguing that the government should be precluded from arguing that Defendants' violated TINA because they failed to provide discovery on this issue and because, as subcontractors, Defendants owed no duty to the government under TINA and accordingly could not have violated its terms.  Mot. in Limine at 8.

As an initial matter, the Court concludes that Defendants' contention that the government failed to provide adequate discovery is without merit.  The interrogatory answer to which Defendants point was the subject of a prior motion in limine by the Defendants, Paper No. 16, and was found by the Court to be "appropriate" given that "Defendants' interrogatories were extremely broadly worded."  See Papers No. 32-33 (denying

Defendants' motion for sanctions, to compel, and in limine and granting summary judgment in favor of the government).[7] While the Fourth Circuit reversed this Court's grant of summary judgment, it did not pass upon the Court's ruling on the motion in limine. The interrogatory answer gave Defendants sufficient notice that the government might pursue a theory of the case based upon the FAR regulations incorporated into the contract between it and DMSI and, by extension, on violations of the statute that the regulations implemented.

Similarly without merit is Defendants' contention that the government seeks to "amend [its] complaint" to include a claim for violation of TINA. See Mot in Limine at 1. It is clear that the government does not seek to bring a claim against Defendants for violations of TINA. See Opp'n to Mot. in Limine at 6. Rather, the government intends to rely on Defendants' alleged violations of TINA and the FAR pricing provisions to "prove a violation of the FCA," arguing that the reason that the claims

---

[7]Defendants' Interrogatory No. 3 asked the government to "identify each specific provision in every contract that you contend limits any defendant's right to markup the product." The government responded by referring the Defendants "to the documents produced pursuant to the Response to Request for Production . . . ." Plaintiff's Answers to Interrogatories.
The government also identified a provision appearing in the IRS solicitation for contracts, DMSI's proposal, and the contract itself which referenced FAR 16.601 governing "Time and Materials" contracts. Finally, the government identified a provision in DMSI's "Teaming Agreement" with RGI in which RGI agreed "to submit to the Prime Contractor a cost proposal . . . consistent with the cost principles and other applicable requirements of Government procurement regulations." Id.
The response did not identify the TINA-related FAR provisions incorporated by reference into DMSI's contract with the government.

RGI submitted to the government were false and fraudulent is "because, among other reasons, the defendants had an obligation to disclose and charge the government for its true costs of the hinge repair kit, but declined to do so." Id. at 11.  It is the failure by RGI to disclose that, while CSM invoiced RGI for $117.00 for each hinge repair kit, CSM's direct "costs" (i.e., what it paid TDR) were only $23.20 to $26.70 per kit, that the government argues made the RGI invoices false or fraudulent under the FCA.[8]

The Court agrees with Defendants that the government's remedy in an action brought under TINA would be against the prime contractor - in this case, DMSI.  In an action under the FCA, however, the government may argue as evidence of Defendants' intent to defraud the government that Defendants knew (within the meaning of the FCA) that they were bound by TINA and its implementing regulations and violated those provisions.  TINA explicitly requires subcontractors "to submit cost or pricing data before the award of the subcontract" where the prime contractor was so required.  41 U.S.C. § 254b(a)(1)(C); See also United States v. Allison Engine Co., Inc., 471 F.3d 610, 623 (6th

---

[8]The government intends to argue two theories of liability at trial: 1) that the invoices submitted by CSM/RGI were false or fraudulent claims under the FCA because the invoices "violated an agreement by the defendants to charge only for direct cost of materials" and 2) that those claims were false or fraudulent because they were made in violation of "TINA and the FAR pricing provisions that were incorporated into the [prime] contract." Opp'n to Mot. in Limine at 6.  The former theory is premised on an agreement that was contained in a cost and pricing proposal RGI submitted to DMSI for inclusion in DMSI's proposal to the government.

Cir. 2006)(noting in dicta that an omission by a subcontractor to disclose pertinent cost or pricing data would violate the military procurement TINA and that knowledge of non-compliance with TINA could create a cause of action under the FCA). Defendants do not dispute that TINA and the FAR pricing provisions were incorporated into the prime contract. Thus regardless of whether a failure to provide this disclosure entitles the government to a remedy against the subcontractor or the prime contractor <u>under TINA</u>, the violation itself may be relevant to the subcontractor's state of mind for FCA purposes. To the extent that the government can produce evidence that Defendants knew that the FAR provisions were incorporated into DMSI's contract with the government, Defendants' motion in limine will be denied.

Similarly, to the extent that the government puts TINA and its implementing regulations at issue in its case, the expert testimony proffered by Defendants as to the relationship between prime contractor and subcontractors under the FAR scheme may be relevant to assist the jury in understanding the government acquisition process and the differences between types of government contracts. <u>See, e.g., Fiataruolo v. United States</u>, 8 F.3d 930, 941 (2nd Cir. 1993) (expert testimony permissible on mixed questions of fact and law even if the opinion goes to the ultimate issue); <u>See also</u>, 29 Charles Alan Wright & Victor James Gold, <u>Federal Practice and Procedure</u> § 6264 n.36 (1997) (noting that courts are more open to "admission of expert legal opinions

where the subject is the application of some complex regulatory or legal standard to a specific factual background."). The Court will revisit this ruling at trial if Mr. Oyer's testimony begins to cross the line into a pure legal opinion.

The government also contends that Mr. Oyer's proposed testimony as to the "reasonableness" of Defendants' costs is irrelevant to the issue in this case because "the government's theory . . . is that defendants are liable under the False Claims Act for failing to make [TINA] required disclosure of the costs of the hinge repair kits . . . . [and TINA and its implementing regulations] do not include an exemption for 'reasonable costs.'" Mot. to Strike at 7. On the subject of reasonableness, Mr. Oyer would opine that, based on prior contract prices paid by the government for laptop repairs, his opinion that DMSI and RGI negotiated a fixed-price contract for the hinge repair kits, and handwritten notes prepared by RGI contemporaneously with the RGI/DMSI price negotiations, the price charged by RGI/CSM for the laptops was objectively reasonable. Expert Report at 5-8.

The government asserts that, even if Defendants could show that the CSM mark-up was reasonable in light of its purported warranty and development costs, it still violated the disclosure requirements of TINA and FAR and that this is sufficient to make the claims false for purposes of FCA liability. Defendants respond that the reasonableness of its costs are relevant to the issue of the government's reliance because the government could not show reliance if allegedly "missing information would not

have changed an otherwise reasonable cost or price." Opp'n to Mot. to Strike at 10.  The government correctly asserts, however, that reliance, while an element of a cause of action under TINA, see Lockheed Martin Corp., 282 F. Supp. 2d at 1331-32, is not an element of an FCA cause of action.  Rather, to prove an FCA violation, the government must show materiality and materiality is a question of law for the court, not the jury.  See United States ex rel. Berge v. Bd. of Trustees of Univ. of Ala., 104 F.3d 1453, 1459 (4th Cir. 1997)(materiality is an element of an FCA cause of action and is a question of law).

The Court concludes, however, in keeping with the Fourth Circuit's decision in this case, that the reasonableness vel non of Defendants' costs is relevant to Defendants' state of mind and to the issue of whether the claims submitted by Defendants were "false or fraudulent" under the FCA.[9]  To the extent that Defendants included reasonable costs for warranty risk and development in the mark-up, a factfinder could find that the Defendants did not act "knowingly" even if they conclude that Defendants were not in compliance with TINA and its implementing regulations.  Accordingly, the government's motion to strike will be denied.

Finally, the government alternatively requests the

---

[9]The Court of Appeals stated that, "viewing the evidence in the light most favorable to all [Defendants], which tends to establish that the CSM markup was for the purpose of covering potential warranty costs, a reasonable factfinder could conclude that they did not submit or cause to be submitted false claims." Rachel, 208 F. App'x at 240.

opportunity to depose Mr. Oyer before trial and to name an expert witness in rebuttal.  Mot to Strike at 7-8.  With regard to a deposition, Rule 26 (b)(4)(A) of the Federal Rules of Civil Procedure provides that "[a] party may depose any person who has been identified as an expert whose opinions may be presented at trial" and the deposition "shall not be conducted" until after the party provides the expert's report.  Defendants intend to call Mr. Oyer at trial and served on the government an expert's report as required by Rule 26(a)(2)(B).  Accordingly, the government shall be allowed to depose Mr. Oyer as provided for in the rules at a time and place mutually agreeable to the parties.

With regard to the government's request to designate an expert witness in rebuttal, Rule 26(a)(2)(C) provides that a party may designate an expert witness "solely to contradict or rebut evidence on the same subject matter identified by another party ... within 30 days after the disclosure made by the other party."  In the instant case, Defendants designated Mr. Oyer on July 31, 2007.  Thus, the government had until August 30, 2007 to designate an expert in rebuttal.  The government instead waited to file its motion to strike until September 26, 2007, sixty days after the designation by Defendants.  While the government failed to so designate an expert in rebuttal within the time period provided under the rules, given that trial now has been postponed and that there was apparent confusion as to which scheduling order governed expert disclosures in this matter, the Court will allow the government to designate its own expert in rebuttal

provided that such designation is made no later than November 2, 2007.

### III. CONCLUSION

For all of the above stated reasons, the government's motion to exclude reference to treble damages will be granted, the government's motion to strike and/or limit expert testimony will be denied, and Defendants' motion in limine will be denied. A separate order will issue.

```
                                     /s/
                          William M. Nickerson
                          United States District Judge
```

Dated: October 17, 2007.